[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 6, 2007
THOMAS K. KAHN
CLERK

No. 06-12815
Non-Argument Calendar
_____

D. C. Docket No. 05-00038-CR-4-RH-WCS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STANLEY JACK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(February 6, 2007)**

Before ANDERSON, BIRCH and MARCUS, Circuit Judges.

PER CURIAM:

Stanley Jack appeals his convictions for making a false statement for the

purpose of influencing the action of a federally insured bank (First South Bank in

Tallahassee, Florida), in violation of 18 U.S.C. § 1014, and bank fraud, in violation

of 18 U.S.C. § 1344. Jack was sentenced to a 7-day term of imprisonment, followed by a 5-year term of supervised release.[1] On appeal, Jack argues that there was insufficient evidence to support his conviction because the government failed to establish that he knew the lending institution to which he submitted false and fraudulent income-tax returns for tax years 1997 and 1998, in support of a loan application for approximately $361,200, was a federally insured bank. He asserts that the loan application named First Financial Mortgage Group ("FFMG") as the lender, but made no mention of First South Bank. After careful review, we affirm.

We review challenges to the sufficiency of the evidence de novo, resolving all reasonable inferences from the evidence in favor of the jury's verdict. See United States v. Rudisill, 187 F.3d 1260, 1267 (11th Cir. 1999). The evidence is sufficient where a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt. United States v. Lluesma, 45 F.3d 408, 409-10 (11th Cir. 1995).

The relevant facts are straightforward. In 1992, Jack, who was 73 years old at the time of trial, won $6,740,000 in the Florida Lottery, payable in an annual amount of $337,000 for twenty years. Jack used his lottery proceeds to purchase a home and invest in several, ultimately unsuccessful, businesses. In 1997 and 1998,

---

[1] Jack currently is released on bond pending resolution of this appeal.

2

Bevon Christie, a tax accountant, prepared Jack's tax returns. His 1997 return reflected an adjusted gross income of $26,088 and significant business losses. His 1998 return showed an adjusted gross income of negative $47,793. Unbeknownst to Christie, on October 14, 1998, Jack sold his lottery annuity to a private company to satisfy debts in the amount of $1,410,699.61. He also received $969,000 in cash.

Christie testified that Jack would regularly bring boxes of receipts to Christie's office in connection with her preparation of Jack's tax returns. Christie said that in late 1999 or 2000, at Jack's request, she recreated tax returns for 1997 and 1998 using numbers Jack supplied and reflecting a different "bottom line" than the original returns. The government entered into evidence the original and altered tax returns. The original returns for 1997 and 1998 indicated adjusted gross incomes of $26,088 and negative $47,793, respectively. The altered 1997 and 1998 returns indicated adjusted gross incomes of $423,665 and $440,634, respectively.

Robert Linzer, a mortgage broker who worked for FFMG and processed Jack's mortgage application, testified that a mortgage broker typically qualifies a borrower, processes the borrower's loan application, and has the borrower sign the loan documents prior to brokering the loan application to different banks. At a

meeting with Jack, Linzer gave Jack the loan application materials, which Jack signed, and Jack provided Linzer with copies of the altered 1997 and 1998 tax returns. Jack sought to refinance his home for $361,250. Linzer subsequently forwarded the application and supporting materials to potential lending banks. Linzer ultimately chose First South Bank as the lender for Jack's mortgage. In approving Jack's loan application, First South Bank relied on the submitted materials, including the altered tax returns for 1997 and 1998.

The closing statement listed FFMG as the lender, but at closing, in a document entitled "First Financial Mortgage Group, Inc.," Jack was notified that FFMG would sell the loan to First South Bank, and that "First South Bank will be contacting you concerning where and how to make your payments."[2] At the

---

[2] In full, the "First Financial Mortgage Group, Inc." document read, in all capital letters:

Dear Mortgagor:

First Financial Mortgage Group, Inc. appreciates the opportunity to originate and assist you with your loan.

It is commonplace within our industry for a loan, once it has been originated, to be sold to another financial institution for servicing. Please be assured that the selling of your loan means little more than sending your payments to the new institution.

First South Bank will be contacting you concerning where and how to make your payments. You will be receiving a payment coupon book. Effective with the December 1, 1999 payment, please forward all payments to the following address:

First South Bank, FSB
P.O. Box 550930

bottom of the one-page document was a payment coupon to First South Bank. After his first and second mortgages were paid off, Jack netted approximately $8,300.

About one year after the closing, Jack defaulted on his mortgage payments and First South then obtained the original 1997 and 1998 tax returns from the IRS. The bank subsequently initiated foreclosure proceedings, after which Jack filed for bankruptcy. After his home was foreclosed and sold, Jack still owed First South Bank $34,006.

Jack testified in his own defense. He said after he had invested his lottery winnings in a series of unsuccessful business ventures, Linzer contacted him about refinancing his house and subsequently came to his house, where Linzer filled out the application based on Jack's answers to his questions. Jack claimed that he went to his accountant to pick up the tax returns Linzer had requested for the application, but denied supplying Christie with any numbers. Jack claimed not to know how the false information had appeared on the fraudulent returns.

---

Jacksonville, Florida 32255

. . .

If you have any questions regarding your loan, please call their customer service department . . . .

    We at First Financial Mortgage Group, Inc. would like to thank you for the opportunity to serve you. If we may be of assistance in the future, please contact us.

At the conclusion of the evidence, Jack moved for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, arguing that the government failed to prove he made a false statement or had a scheme to defraud First South Bank. The district court denied his motion. The jury found Jack guilty on both counts and he renewed his Rule 29 motion.

After a hearing on the renewed motion, the district court found that a reasonable jury could conclude beyond a reasonable doubt that Jack willfully provided false representations, and that "he knew those representations would be provided to First South Bank." The district court noted that while there was no direct evidence that Jack was told that First South would provide the funds, the "First Financial Mortgage, Inc." document was "a critical piece of evidence." Although the document came into existence after the loan application and false tax returns had been provided, the district court found that the "timing doesn't matter." Because Jack had the information contained in the "First Financial Mortgage, Inc." document, the court found the following: "[i]n effect, at the closing, by signing the documents, Mr. Jack reaffirmed the representations that had been made to that point, including the representations made in the false tax returns." After denying the renewed Rule 29 motion, the district court sentenced Jack to seven days'

imprisonment, followed by a 60-month term of supervised release, and ordered him to pay $34,006 in restitution. This appeal followed.

Jack argues the district court erred by denying his motion for judgment of acquittal because the government's evidence was insufficient to prove that he knew the lender was a federally insured bank. Jack was convicted of violating 18 U.S.C. § 1014[3] and 18 U.S.C. § 1344,[4] both of which require that the fraudulent activity be directed at a federally insured financial institution. We have held that "[t]he requisite intent for bank fraud is present if defendant's conduct was 'designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential

---

[3]Section 1014 provides the following:

[w]hoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, . . . upon any . . . commitment, or loan . . . shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years or both.

18 U.S.C. § 1014.


[4]Section 1344, in turn, applies to a defendant who:

knowingly executes, or attempts to execute, a scheme or artifice– (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

18 U.S.C. § 1344.

7

loss.'" See United States v. Key, 76 F.3d 350, 353 (11th Cir. 1996). "In a similar way, a defendant convicted of violating section 1014 must have acted 'for the purpose of influencing . . . the action of a federally insured institution engaged in a lending activity.'" Id. (quoting United States v. McDow, 27 F.3d 132, 135 (5th Cir. 1994) (internal quotation marks omitted)).

Thus, the focus of the scienter inquiry is whether the defendant's purpose was to influence the action of a federally insured institution, rather than whether the defendant's fraudulent representations were made directly to a federally insured institution. Id.; see also United States v. Everett, 270 F.3d 986, 989 (6th Cir. 2001) (holding that government's evidence was sufficient to support conviction for bank fraud where evidence demonstrated that the "defendant in the course of committing fraud on someone causes a federally insured bank to transfer funds under its possession and control."); cf. United States v. Edelkind, 467 F.3d 791, 797-98 (1st Cir. 2006) (affirming conviction for bank fraud where evidence established that parties, including defendant, contemplated the involvement of a federally insured entity from the outset of the refinancing process, federally insured institution's forms were used prior to closing, and loan was transferred to insured institution one month after closing).

Here, the government presented abundant evidence of Jack's extensive experience in the business world. He had served as the president of a Kiwanis Club and had been involved in the ownership, operation and management of various business ventures. The jury easily could have inferred from the evidence of Jack's business experience, when coupled with the "First Financial Mortgage Group, Inc." document provided to Jack at closing, that Jack knew that the fraudulent tax returns ultimately would influence a federally insured institution engaged in a lending activity. Again, evidence sufficient to support a conviction need not exclude every reasonable hypothesis of innocence or be "wholly inconsistent with every conclusion except that of guilt." United States v. Montes-Cardenas, 746 F.2d 771, 778 (11th Cir. 1984) (quotations omitted)). This is so because "[a] jury is free to choose among reasonable constructions of the evidence." Id.

On this record, we readily conclude that a reasonable fact-finder could find that the evidence established Jack's guilt beyond a reasonable doubt. Accordingly, we affirm.

**AFFIRMED.**