Opinion by Judge KOZINSKI; Dissent by Chief Judge THOMAS.
ORDER
The opinion and dissent filed on December 4, 2013, and published at 736 F.3d 1263, are hereby withdrawn and replaced by the amended opinion and dissent filed concurrently with this order. With these amendments, Judges Kozinski and Trott have voted to deny the petition for panel rehearing, Judge Kozinski has voted to deny the petition for rehearing en banc and Judge Trott has so recommended. Chief Judge Thomas has voted to grant the petition for panel rehéaring and the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35. The petitions for panel rehearing and rehearing en banc are denied. No further petitions for panel rehearing or rehearing en banc will be entertained.
OPINION
KOZINSKI, Circuit Judge:
Does an immigration judge err by relying on a State Department investigation of an asylum petitioner’s claim?
I. BACKGROUND
Nikolay Angov, a Bulgarian citizen, claims he was persecuted by the Bulgarian government because he is Roma.[1] He alleges repeated abuse at the hands of the Bulgarian police, including beatings, false accusations of crimes and illegitimate arrests. After three years of this treatment, he fled Bulgaria and sought asylum in the United States.
An IJ conducted asylum hearings in early 2004, during which Angov presented several documents, including two Bulgarian subpoenas that ordered him to appear at a Sofia police station. The immigration judge (“IJ”) allowed the government to obtain a State Department investigation of Angov’s allegations. See 8 C.F.R. § 208.11. The investigation was conducted by our consulate in Sofia, and the results were summarized in a letter signed by Cynthia Bunton, Director of Department of State’s Office of Country Reports and Asylum Affairs.
The IJ admitted the Bunton Letter, which stated that the Embassy had contacted “an official in the Archive Department at the 5th Police District in Sofia.” The official found a number of errors in the subpoenas, suggesting that they were forgeries: (1) Three officers named in the subpoena — Captain Donkov, Lieutenant Slavkov and Investigator Vutov — never worked for the police department; (2) the case and telephone numbers were wrong; and (3) although the subpoenas mentioned room 4 on the second floor of the department and room 5 on the first floor, there are no rooms by those numbers. The *897 official also explained (4) that the seal on the subpoena was too small.
Bunton also stated that the embassy investigator (5) was unable to locate An-gov’s claimed past residences; and (6) that the neighborhood where Angov lived was only twenty to thirty percent Roma, though Angov claimed that he lived in a “gypsy neighborhood.” Attached to the letter were five photographs of the places the investigator had visited while trying to verify the addresses.
Angov’s industrious lawyer submitted a plethora of rebuttal evidence, including photos, maps, an article about Angov’s neighborhood and a letter apparently signed by someone named Daniela Mihay-lova, who identified herself as the legal programs director of a Roma human rights organization in Bulgaria. Angov also argued that, without the opportunity to cross-examine the investigator, the admission of the Bunton Letter would violate his statutory and constitutional rights.
In response to Angov’s objection, the government attorney asked the State Department to produce an employee to testify about the investigation. State responded with a letter authored by Nadia Tongour, Bunton’s successor. The Tong-our Letter provided some general background information on State’s investigation procedures, but explained that it’s State’s policy to refrain from providing further specific information about an overseas investigation.
Based on the Bunton Letter, the IJ made an adverse credibility finding and denied Angov’s applications for asylum, withholding of removal and relief under the Convention Against Torture. The Board of Immigration Appeals (“BIA”) adopted and affirmed the IJ’s ruling denying relief, and his determination that the subpoenas are fraudulent. The BIA also denied Angov’s motion to supplement the record with a recent Sixth Circuit opinion that Angov claimed constituted new evidence of a “pattern and practice” of lawbreaking by officials in the Sofia consulate. See Alexandrov v. Gonzales, 442 F.3d 395 (6th Cir.2006).
II. ANALYSIS
A. Motion to Remand
Angov claims the BIA abused its discretion by denying his motion. See Movsisian v. Ashcroft, 395 F.3d 1095, 1098 (9th Cir.2005). His brief before the BIA spent just two sentences explaining this argument:
Respondent respectfully submits a copy of Alexandrov v. Gonzales to supplement the record in this case. The document is submitted to document a pattern and practice of procedural and substantive violations of the law and applicable regulations by the consulate in Sofia during overseas investigations and in divulging the identity of asylum applicants to the authorities in Bulgaria in violation of C.F.R. 208.6 [sic].
“Since a motion to remand is so similar to a motion to reopen, the motion to remand should be drafted in conformity with the regulations pertinent to motions to reopen.... ” Rodriguez v. INS, 841 F.2d 865, 867 (9th Cir.1988) (internal quotation marks omitted). The applicable regulation provides that a motion to reopen shall state “the new facts that will be proven at a hearing to be held if the motion is granted” and be supported by affidavits or other “evidentiary material.” 8 C.F.R. § 1003.2(c)(1). But Angov didn’t provide any evidence supporting his motion nor did he even explain why he believed that section 208.6 had been violated.[2] The BIA did not abuse its discretion in denying Angov’s motion to remand.
*898 B. Admission of the Bunton Letter
Angov claims that the admission of, and the IJ’s and BIA’s reliance on, the Bunton Letter violated his statutory and constitutional rights. See 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. § 1240.10(a)(4); Cinapian v. Holder, 567 F.3d 1067, 1074-75 (9th Cir.2009). In considering Angov’s argument, we review the IJ’s decision, except for the portion that the BIA didn’t clearly adopt — here, the IJ’s conclusion that the Department of State’s inability to verify Angov’s addresses supported an adverse credibility finding. See Joseph v. Holder, 600 F.3d 1235, 1239-40 (9th Cir.2010). On that issue, we review the BIA’s decision.
While we review legal questions de novo, “[t]he BIA’s interpretation and application of the immigration laws are generally entitled to deference.” Hernandez-Mancilla v. Holder, 633 F.3d 1182, 1184 (9th Cir.2011); Zetino v. Holder, 622 F.3d 1007, 1011-12 (9th Cir.2010). The agency’s factual findings — such as its adverse credibility determination — are reviewed for substantial evidence and can be reversed only if the evidence “compels” a contrary conclusion. See Rizk v. Holder, 629 F.3d 1083, 1087-88 (9th Cir.2011) (emphasis omitted).
(i) Due Process
Angov claims that the IJ’s reliance on the Bunton Letter violated his constitutional right to procedural due process. But Angov has no such right. He is an alien who has never formally entered the United States. He presented himself at the San Ysidro port of entry without valid entry documents and sought asylum. “[A]n alien seeking admission has not ‘entered’ the United States, even if [he] is in fact physically present.” Kwai Fun Wong v. United States, 373 F.3d 952, 971 (9th Cir.2004). “[0]ur immigration Taws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry.” Leng May Ma v. Barber, 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). Aliens “who have once passed through our gates, even illegally,” are afforded the full panoply of procedural due process protections, and “may be expelled only after proceedings conforming to traditional standards of fairness.” Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953). But those, like Angov, who have never technically “entered” the United States have no such rights. Id. For Angov, procedural due process is simply “[w]hatever the procedure authorized by Congress” happens to be. Id. (internal quotation marks omitted); see also Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (“[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application.... ”).
Angov’s claim of a procedural due process violation simply can’t be squared with the Supreme Court’s teachings in Mezei and Landon, nor with our circuit’s settled precedent. See Barrera-Echavarria v. Rison, 44 F.3d 1441, 1449 (9th Cir.1995) (“[E]xeludable aliens have no procedural due process rights in the admission process .... ”).[3]
*899 (ii) Statutory Rights
Angov’s challenge to the admission of the Bunton Letter is therefore purely statutory. In assessing such a challenge, we must first ask whether the IJ made legal error by denying Angov any of his statutory rights. Angov claims that he was denied his right to examine evidence against him. See 8 U.S.C. § 1229a(b)(4)(B). But the record tells a different story. He was allowed to examine the Bunton Letter, and given ample time to produce substantial evidence to rebut it. See p. 896 supra; cf. Cinapian, 567 F.3d at 1076 (had the government given petitioners a chance to examine forensic reports before hearing, they may have been able to produce rebuttal evidence).
Angov also argues that he was denied his statutory right to cross-examine the witnesses against him. We’ve held that, before hearsay statements made by an absent witness can be admitted into an immigration hearing, “ ‘the government must make a reasonable effort ... to afford the alien a reasonable opportunity to confront the witnesses against him or her.’” Hernandez-Guadarrama v. Ashcroft, 394 F.3d 674, 681 (9th Cir.2005) (quoting Saidane v. INS, 129 F.3d 1063, 1065 (9th Cir.1997)); see also § 1229a(b)(4)(B); Baliza v. INS, 709 F.2d 1231, 1234 (9th Cir.1983).
The government is, of course, not required to produce Bulgarian police officials at an immigration hearing in the United States. Such a requirement would make it virtually impossible for the government to introduce evidence rebutting an alien’s claims relating to conduct abroad. Instead Angov, and the dissent, claim that the immigration authorities should have obtained a witness from the Department of State to verify the letter’s contents. But hauling State Department officials into court wouldn’t ameliorate the dissent’s concerns, because the letters they author inescapably rely on foreign officials who aren’t amenable to cross-examination.
In any event, the government here did make a reasonable effort to obtain a State Department witness, but was prevented from doing so by State’s policy of not releasing follow-up information regarding its overseas investigations. The dissent claims that “allowing one executive branch agency to rely on another executive branch agency’s blanket policy of refusing to provide certain information is tantamount to granting the government the kind of unfettered discretion we repudiated in Baliza.” But Baliza offers no support to the dissent’s position. There the government relied on the affidavit of an alien’s ex-wife as the basis for a fraudulent marriage charge while barely even trying to investigate her whereabouts. The declarant was not a government official and the government *900 gave no justification for failing to find her. By contrast, the declarant here is a government official speaking in her official capacity. And the immigration authorities’ decision not to present her in person was made pursuant to a coordinate department’s reasonable policy governing the secrecy and safety of its officers. Because neither the immigration authorities nor the State Department acted unreasonably in failing to compel Bunton to testify, Angov’s statutory rights were not violated.
(iii) Substantial Evidence
Because the IJ did not erroneously deny Angov a statutory right, our review is limited to whether the IJ’s adverse credibility finding was supported by substantial evidence. “This strict standard bars a reviewing court from independently weighing the evidence,” and requires us to “deny the Petition unless Petitioner [has] presented evidence so compelling that no reasonable factfinder could find that Petitioner” was not credible. Singh v. INS, 134 F.3d 962, 966 (9th Cir.1998) (internal quotation marks omitted).
Despite the generally flexible— and highly deferential-nature of substantial evidence review, Angov appears to argue for a per se rule under which immigration judges must blind themselves to the findings of a State Department letter, unless it provides particular information regarding how an investigation was conducted. Surprisingly, Angov’s radical proposal accords with the view of the Second Circuit, which has held that a document akin to the Bunton Letter was “inherently unreliable” because it didn’t reveal the qualifications of the investigator, the extent of the investigation or the methods used to verify the information. Lin v. U.S. Dep’t of Justice, 459 F.3d 255, 271-72 (2d Cir.2006). Under Second Circuit law, therefore, documents like the Bunton Letter categorically “cannot support [an] adverse credibility finding.” Id. at 272. We reject this approach. Substantial evidence review requires an appellate court to consider the reasonableness of an agency’s conclusions; it does not empower us to craft quasi-statutory criteria governing the admissibility of evidence in agency proceedings. In light of our departure from the holding of a sister circuit — one with the second-largest immigration docket in the country — we offer a thorough explanation for our rationale.
1. Congress and the Attorney General have accorded aliens like Angov a variety of procedural rights, including the right to be present at the hearing; to be represented by counsel; to examine the evidence against him and present counter-evidence; to cross-examine witnesses; and to have a written record kept of the proceedings. 8 U.S.C. § 1229a(b)(4). But neither the statute nor the regulations give the asylum applicant a right to a particular quality of the evidence presented against him. Instead, he is given the right to have an impartial adjudicator assess the evidence. When exercising grace towards individuals entitled no procedural rights under the constitution, Congress can set the precise limits of what it grants and what it withholds. That then defines the process an asylum seeker like Angov is due.
With that in mind, let’s put Angov’s claims into some context. The IJ found that Angov presented forged documents. This is a serious matter that, if true, should not merely result in the immediate termination of Angov’s asylum petition, but also in criminal prosecution for immigration fraud. But the IJ wasn’t fazed by discovery of the fraud; he went on to decide whether Angov’s asylum claim could be sustained despite the forgeries. No other adjudicator in the United States would react with such equanimity to finding that a party had tried to bamboozle it.
*901 This points to an unfortunate reality that makes immigration cases so different from all other American adjudications: Fraud, forgery and fabrication are so common — and so difficult to prove — that they are routinely tolerated. Our circuit is no exception. See Abovian v. INS, 257 F.3d 971 (9th Cir.2001) (Kozinski, J., dissental).
The reason for this deplorable state of affairs is not difficult to figure out. The schizophrenic way we administer our immigration laws creates an environment where lying and forgery are difficult to disprove, richly rewarded if successful and rarely punished if unsuccessful. This toxic combination creates a moral hazard to which many asylum applicants fall prey.
First, the reward: the opportunity to be lawfully admitted into the United States. Those born with U.S. citizenship cannot imagine what this is worth to the world’s poor and oppressed billions, most of whom would come here tomorrow if they could. Gaining a lawful foothold in America is an incalculable benefit. It sets an immigrant on the path to a peaceful life in a free society, economic prosperity, citizenship and the opportunity to bring family members in due course. A prize like this is worth a great deal of expense and risk. Telling an elaborate lie, and coming up with forged documents and mendacious witnesses to back it up, is nothing at all when the stakes are so high.
And the risk of getting caught is low. As eight members of this court pointed out in Abovian:
The specific facts supporting a petitioner’s asylum claim — when, where, why and by whom he was allegedly persecuted — are peculiarly within the petitioner’s grasp. By definition, they will have happened at some time in the past— often many years ago — in a foreign country. In order for the INS to present evidence “refuting or in any way contradicting” petitioner’s testimony, it would have to conduct a costly and often fruitless investigation abroad, trying to prove a negative — that the incidents petitioner alleges did not happen.
257 F.3d at 976. There’s very little the United States can do to investigate obscure incidents that allegedly occurred in countries on the other side of the globe. Even if it were economically feasible, we can’t send the FBI into a foreign country to conduct a full field investigation. The best we can do is to have consular personnel check basic facts, in addition to the many other functions they perform. And we have very few U.S. consular personnel on the ground in most countries; in all of Bulgaria, there are fewer than two dozen. See U.S. Sec’y of State, 1 Congressional Budget Justification, Department of State Operations, Fiscal Year 2013, at 306 (2012). All told, there are fewer than 6000 consular officials in embassies and consulates spread out across more than 170 countries. Id. at 227-311.
Finally, if an alien does get caught lying or committing fraud, nothing very bad happens to him. Sure, he may be ordered removed, but most aliens who aren’t in custody remain here long after their removal orders become final. See, e.g., Office of the Inspector Gen., U.S. Dep’t of Justice, The Immigration and Naturalization Service’s Removal of Aliens Issued Final Orders iii (2003) (reporting that “the INS removed only 3 percent of nonde-tained asylum seekers with final removal orders”); see also Mark Hamblett, Circuit Sets Policy for Removal Cases Deemed Low Priority by U.S., N.Y. L.J., Oct. 18, 2012 (discussing policy that calls for “the exercise of prosecutorial discretion to focus removal efforts on the most high-priority cases”). And if they do get sent back — at our expense — what’s lost? They wind up where they started. Would-be immigrants almost never get prosecuted for presenting forged documents in support of asylum *902 petitions, unless they commit some additional misconduct. See, e.g., United States v. Jawara, 474 F.3d 565, 570 (9th Cir.2007) (defendant charged with document fraud and conspiracy to commit marriage fraud). Consequently, immigration fraud is rampant.
Take, for instance, Angov’s compatriot, Pavel Pavlov. Pavlov sought asylum as a persecuted gypsy, just like Angov. They even have the same lawyer. But Pavlov’s story took a different turn when his wife gained U.S. citizenship and he sought adr justment of status. In the process, he had to disclose that his asylum application was a tissue of lies. Specifically, Pavlov admitted that he wasn’t persecuted in Bulgaria. In fact, he’s not even a gypsy.
Americans galore wind up in federal prison every year for far less significant lies on government forms or bank loan applications. See, e.g., United States v. Prince, 647 F.3d 1257, 1260-61, 1265 (10th Cir.2011); United States v. Sandlin, 589 F.3d 749, 751-53 (5th Cir.2009); United States v. Jack, 216 Fed.Appx. 840, 841-43 (11th Cir.2007). So was Pavlov appealing his criminal conviction? Certainly not. The BIA barred Pavlov from obtaining any relief under our immigration laws because he had filed a frivolous (read: fraudulent) asylum petition — a decision he had the chutzpah to appeal. See Pavlov v. Holder, 697 F.3d 616 (7th Cir.2012).
Cases involving fraudulent asylum claims are distressingly common. See, e.g., Cheema v. Holder, 693 F.3d 1045, 1046-47 (9th Cir.2012); Dol v. Holder, 492 Fed.Appx. 774, 775 (9th Cir.2012); Zheng v. Holder, 672 F.3d 178, 180-81 (2d Cir.2012); Fernandes v. Holder, 619 F.3d 1069, 1074-76 (9th Cir.2010); Ghazali v. Holder, 585 F.3d 289, 290-91 (6th Cir.2009); Ribas v. Mukasey, 545 F.3d 922, 925-26 (10th Cir.2008); Siddique v. Mukasey, 547 F.3d 814, 815-16 (7th Cir.2008); Rafiyev v. Mukasey, 536 F.3d 853, 855-57 (8th Cir.2008); Dhital v. Mukasey, 532 F.3d 1044, 1047-48 (9th Cir.2008) (per curiam); Chen v. Mukasey, 527 F.3d 935, 938-39 (9th Cir.2008); Ahir v. Mukasey, 527 F.3d 912, 914-16 (9th Cir.2008). And for every case where the fraud is discovered or admitted, there are doubtless scores of others where the petitioner gets away with it because our government didn’t have the resources to expose the lie.
The Second Circuit has given this already shaky system a swift kick in the gut. As we explain further below, its ruling makeá it pretty much impossible for the immigration authorities to carry out even the little bit of fact checking they now manage to do. Its decision smothers the State Department’s informal process of checking up on asylum petitions in layers of procedural complexity that will prove impossible to administer in practice. Perhaps the Supreme Court or Congress will intervene and decide who’s right.
2. The basic question that confronts us is this: In a system where there are pervasive, structural incentives for fraud, are we to disable our triers of fact from considering certain evidence — which may be essential to weeding out fraudulent claims — when that evidence lacks particular details that may bear on its reliability? Remember, the Second Circuit regards documents like the Bunton Letter as inherently unreliable. We need not — and do not — conclude that such letters will always lead to adverse credibility findings; we simply disclaim the conclusion that they must be excluded from an immigration judge’s consideration when they fail to provide sufficient identifying detail.
We acknowledge the Bunton Letter lacks certain indicia of reliability, but we cannot say, under our “extremely deferential” review, that its use alone constitutes grounds to reverse the IJ’s adverse credibility determination. Wang v. INS., 352 *903 F.3d 1250, 1257 (9th Cir.2003). First of all, Angov has the burden of proving his eligibility for asylum. See 8 C.F.R. § 1208.13(a). The government has no burden; it can present evidence solely to rebut or impeach petitioner’s case. The IJ and the BIA could reasonably conclude that the Bunton Letter is at least sufficient to cast doubt on Angov’s evidence and force him to come up with more solid proof to support his claim.
Angov finds fault with the Bunton Letter because it “provides no information as to who conducted the investigation; who obtained, stored and verified the information underlying the conclusion expressed in the document [or] when and under what authority the investigation was conducted.” He notes that the Bunton Letter offers no explanation for many of its conclusions— for example, that both the case numbers and the telephone numbers listed on the fraudulent subpoenas were incorrect. These are all interesting points to raise at the hearing, and the absence of a satisfactory response from the government might well convince the trier of fact to disregard the letter. But in this instance, the IJ, in his discretion, chose to credit the letter. That was his prerogative, and our review is limited to whether that decision is permissible in light of the evidence.
The doubts as to the letter’s, reliability flow from the fact that the rules of evidence, and the hearsay rules in particular, don’t apply to administrative proceedings. See Richardson v. Perales, 402 U.S. 389, 400-02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Hernandez-Guadarrama v. Ashcroft, 394 F.3d 674, 681 (9th Cir.2005). This inevitably leaves some uncertainty that would be eliminated if this were a formal trial subject to the rules of evidence. But it doesn’t deprive the opposing party of any and all means of rebutting the hearsay declarant’s assertions.
The Bunton Letter does come to certain factual conclusions: that the addresses identified by Angov in his asylum petition don’t exist; that the officers — Captain Donkov, Lieutenant Slavkov and Investigator Vutov — and room numbers specified in the subpoenas presented by Angov don’t exist; that the seals on the subpoenas are the wrong size; and that the part of the city where Angov claimed to live was only twenty to thirty percent Roma. Each of these assertions describes facts in the real world, so it’s possible to rebut Bunton by presenting proof that those facts are not as the Bunton Letter describes them.
In fact, Angov did precisely that with respect to the two addresses. He presented a letter from someone in Bulgaria, who explained that the Bunton Letter’s conclusions about the addresses are wrong. See p. 896 supra-, Appendix. And the BIA seems to have been swayed, as it noted that the “record is unclear” about whether Angov was telling the truth about the addresses.
Angov was free to present similar evidence to undermine the Bunton Letter’s statements about the subpoenas. He could have had Ms. Mihaylova from the human rights organization or some other friend in Sofia visit the police station and try to find out whether the rooms referenced in the Bunton Letter do or don’t exist. He might also have been able to obtain a roster of the names of police officials in Sofia and shown that it contains the names of the officers referenced in the subpoenas.
The Bunton Letter also asserts that the phone numbers in the subpoenas aren’t correct. Angov or one of his friends could have called the numbers and asked whether he’d reached the police station — and then submitted an affidavit to that effect. The same is true about the seals: Angov or his friends might have tried to obtain an *904 official copy of the police seal from the Bulgarian government and introduced it into evidence. He did none of these things, perhaps because he knew that the subpoenas were forged.
Where the petitioner has the burden of proof, there’s nothing unfair about having a U.S. government agent check out some of his basic facts and inform the IJ of possible discrepancies. This forces the petitioner to obtain further evidence supporting the challenged claims. There might be situations where obtaining further evidence is impossible, such as where the petitioner has fled from a closed society and can find no one willing or able to obtain the evidence he needs. In such cases, we don’t hold the petitioner’s failure to present evidence against him. See Singh v. Holder, 638 F.3d 1264, 1270-71 (9th Cir.2011). But Angov has never claimed that he couldn’t get more evidence; indeed he has resources in Bulgaria with which to do so. Based on the almost complete absence of rebuttal evidence on Angov’s part, the IJ was not unreasonable to credit the allegations in the Bunton Letter.
3. There’s nothing particularly exotic about assessing an asylum applicant’s credibility by comparison with an extrinsic source. For example, the Bunton Letter’s estimate that Angov comes from a community that is only twenty to thirty percent Roma is similar to the kind of demographic estimates made by the State Department in its country reports, on which we and the BIA rely all the time. See, e.g., Dhillon v. Holder, 485 Fed.Appx. 252, 253 (9th Cir.2012); Patel v. Holder, 474 Fed.Appx. 584, 585 (9th Cir.2012); Sesay v. Holder, 469 Fed.Appx. 617, 617 (9th Cir.2012); see also Sowe v. Mukasey, 538 F.3d 1281, 1285 (9th Cir.2008) (“U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations.” (internal quotation marks omitted)); cf. 8 U.S.C. § 1158(b)(1)(B)(iii).
Were we to hold that we can’t rely on this estimate in the Bunton Letter, we’d be casting doubt on a multitude of country reports that have no better support for their demographic estimates than the Bun-ton Letter. The country reports are, after all, prepared by the very same consular officials, using some of the same methods, as the Bunton Letter. See Bureau of Democracy, Human Rights & Labor, U.S. Dep’t of State, Country Reports on Human Rights Practices for 2012: Appendix A: Notes on Preparation of Reports, at 1 (2012). Indeed, Cynthia Bunton’s title when she wrote her letter was director of the Department of State’s “Office of Country Reports and Asylum Affairs.” (emphasis added). Nadia Tongour is her successor. Adopting Angov’s objection to the findings in the Bunton Letter could render country reports inadmissible in immigration proceedings.
Angov complains that the Bunton Letter might have relied on reports from foreign service nationals (FSNs). See Ezeagwuna, 325 F.3d at 406. What if it did? Our embassy in Sofia, as elsewhere, employs roughly the same number of FSNs and Americans. U.S. Sec’y of State, 1 Congressional Budget Justification, Department of State Operations, Fiscal Year 2013, at 306 (2012). Our short-staffed consular offices no doubt use FSNs, who are fluent in the local language and familiar with local conditions, to do some of the legwork. We see nothing wrong with that. Whether the investigation was conducted by U.S. citizens, FSNs or Hercule Poirot, it resulted in certain factual conclusions that can be refuted.
Submissions such as the Bunton Letter .and the various country reports on which we routinely rely aren’t just a collection of statements by disconnected individuals. *905 Rather, they are the unified work product of a U.S. government agency carrying out governmental responsibilities. As such, the report itself, and the acts of the various individuals who helped prepare it, are clothed with a presumption of regularity. See Nat’l Archives & Records Admin. v. Favisk, 541 U.S. 157, 174, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004); see also Kohli v. Gonzales, 473 F.3d 1061, 1068 (9th Cir.2007). “[I]n the absence of clear evidence to the contrary, courts presume that [these individuals] have properly discharged their official duties.” Favish, 541 U.S. at 174, 124 S.Ct. 1570 (quoting United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)).
The presumption of regularity has been applied far and wide to many functions performed by government officials. See, e.g., U.S. Postal Serv. v. Gregory, 534 U.S. 1,10,122 S.Ct. 431, 151 L.Ed.2d 323 (2001) (Post Office disciplinary procedures); United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (prosecutorial decision making); FCC v. Schreiber, 381 U.S. 279, 296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965) (FCC’s decision making process); cf. INS v. Miranda, 459 U.S. 14, 16-18, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam) (processing of visa application).
The Bunton Letter is entitled to the presumption that those who participated in its preparation, be they FSNs, consular officers or officials at the State Department in Washington, did their jobs fairly, conscientiously and thoroughly; that each officer in the chain relied on the work of someone down the chain in whom he had confidence; that no one had a personal stake in the substance of the report; and that no one lied or fabricated evidence. Without this presumption, country reports would be no more useful than the Farmers’ Almanac or Perezhilton.com.
The dissent argues that the presumption of regularity doesn’t apply here because “[t]he key hearsay statement in the Bun-ton Letter comes from a Bulgarian police employee, not a U.S. government official.” But that would remain true, even with the procedural protections the Second Circuit advocates. Those protections don’t prevent Bulgarian police officers from lying, they simply make it easier for an IJ to assess the quality of investigation conducted by our consular officials — the very officials we presume reliable. As with a country report, the information in a consular letter may be based, in part, on hard-to-verify statements made by local officials. That’s a reason to take the information contained in such letters with a grain of salt — as an IJ is entitled to do — not a reason to deem them inadmissible in their entirety.
The similarities between the Bunton Letter and the litany of documents used, and accepted, in everyday asylum adjudications speaks to a fundamental misapprehension on the part of the Second Circuit and the dissent. Immigration adjudication necessarily requires consideration of all manner of imperfect sources. But we do neither inimigrants nor the immigration authorities a service by cabining the range of permissible documents on which a trier of fact can rely in making his decision. In assessing whether an incident occurred years ago in a faraway country with an unfamiliar culture and political system, an immigration judge must be able to read, assess and weigh as much information as possible. True, dismissing a petition in reliance on an unsworn letter might seem harsh; but so is dismissing a petition based on relatively minor testimonial inconsistencies in the convoluted story of an immigrant who may have only a weak command of English and a hazy memory of his flight from terror. Harshness is endemic to any asylum system. Here, the *906 IJ came to the conclusion that the unrefut-ed contents of the Bunton Letter cast doubt on the subpoenas Angov presented as evidence. Do we really better serve justice, or the immigration process more generally, by compelling the IJ to either accept the dubious subpoenas as genuine, or base his review solely on his instincts as to what a Bulgarian subpoena “should” look like?
An implicit assumption of the Second Circuit’s approach is that the exclusion of documents such as the Bunton Letter will lead, not to reliance on capricious information, but to the proliferation of more comprehensive and reliable State Department investigations. There’s no reason to believe that will happen. The asylum unit of the Department of State’s Office of Country Reports and Asylum Affairs “has suffered from long standing resource problems.” Office of the Inspector Gen., U.S. Dep’t of State, Report of Inspection: Bureau of Democracy, Human Rights and Labor 23 (2003). Many of its staffers are interns, and even its regular employees are often “pressed into service to work” on the Office’s other main responsibility: country reports. Id. at 23-24. And the consular officers tasked with verifying asylum applicants’ claims are also overworked and understaffed. The Tongour Letter expresses the government’s position on providing additional information about the results of an overseas investigation: “Such additional demands are further burdens on Consular Officers in the performance of their regular responsibilities and are particularly onerous for FSNs who may be subject to local reprisal.” The State Department tells us it’s doing the best it can with the scant resources allocated to it and our consular corps abroad.
Demanding that the reports contain a multitude of additional details, such as “the identity and qualifications of the investigator(s),” “the objective and extent of the investigation” and “the methods used to verify the information discovered,” see Lin, 459 F.3d at 271, transforms a process that is swift, efficient and informal into one that’s ponderous, time-consuming and expensive.
Insisting on these procedures would paralyze the process, making it impossible for our consular officers to do many of these investigations because they’re too busy filling in all the jots and tittles our sister circuit enshrines as pre-requisites for a document’s admission. Complying with such requirements considerably lengthens the time it takes to write most reports, and may make it impossible to write others for fear of disclosing sensitive information that could compromise sources or impair relations with local officials.
Nor is it realistic for the government to produce such information in camera. These reports are prepared by Department of State officials stationed in foreign countries, and are then turned over to another agency in another department, which then releases them to an adverse party. These disclosures are made in the context of immigration court proceedings, not in district court, and the immigration court, despite its name, is an executive branch agency. It has no contempt powers and can’t have anyone arrested for violating its orders, including confidentiality orders. See Stephen H. Legomsky, Restructuring Immigration Adjudication, 59 Duke L.J. 1635, 1674, 1714 (2010); Dana Leigh Marks, Still a Legal “Cinderella”? Why the Immigration Courts Remain an Ill-Treated Stepchild Today, 59 Fed. Law.; Mar. 2012, 25, at 30. There’s a good chance the information will fall into the hands of people who have little regard for U.S. law and find themselves repatriated with a motive for revenge. Consular officials forced to disclose sensitive information in these circumstances would probably *907 leave the information out of the report rather than risk burning their sources, offending local officials or losing their lives.
If we make the job of compiling these reports substantially more risky and onerous, the State Department may stop writing them. The United States gets close to 74,000 asylum cases a year, far more than any other industrialized nation. See United Nations High Comm’r for Refugees, Asylum Levels and Trends in Industrialized Countries 3, 8 & n. 14 (2011). (That’s more than three times the number of Social Security cases the Supreme Court considered massive in Perales). The use of reports from consular officials gives the government the ability to check facts and puts at least some constraint on how far from the truth asylum applicants will stray. Knocking out even this most basic check on fraud and fabrication would subvert the asylum process, giving charlatans a free pass into the United States.
4. In any event, even if the Second Circuit’s approach were to encourage more detañed State Department letters, such “faith in procedural choreography” as a truth-seeking device is “fundamentally flawed.” United States v. Balough, 820 F.2d 1485, 1491 (9th Cir.1987) (Kozinski, J., concurring). Requiring the Department of State to disclose more detafls will neither materially enhance the reliabflity of the resulting report nor do very much to help asylum applicants.
We test this proposition by modifying a portion of the Bunton Letter to comply with the requirements that would (presumably) satisfy the Second Circuit; new or modified language is italicized:
Agent Michael Smith, a foreign service agent with seventeen years of field experience who is fluent in Bulgarian, ordered Vladimir Popov, a foreign service national in the Embassy’s employ, to visit the 5th Police District station in Sofia in order to seek authentication of the two subpoenas. FSN Popov is a lifelong resident of Sofia and has worked for the Embassy for two years. He is fluent in Bulgarian and speaks conversational English.
FSN Popov traveled to the station and, once there, spoke to Ludmilla Bogdanovich, who is the supervisor of personnel records at the station. FSN Popov considers Ms. Bogdanovich a trustworthy source. After she consulted the relevant records, Ms. Bogdano-vich told FSN Popov that Captain Donkov, Lieutenant Slavkov and Investigator Vutov have never worked for the 5th Police District. Ms. Bogdano-vich also told FSN Popov that the case numbers on the subpoenas were not correct, there was no room 4 on the second floor and no room 5 on the first floor and that the telephone numbers on the subpoenas were incorrect. While at the station, FSN Popov asked Ms. Bogdanovich for an imprint of the police station seal, which he brought back to the consulate. Agent Smith compared it to the seal on the two subpoenas and found the official seal to be much larger.

After hearing FSN Popov’s oral report of his meeting with Ms. Bogdano-vich, Agent Smith transmitted the information to the author of this letter by encrypted email.

Best we can tell, this revised letter would comply with the requirements imposed by the Second Circuit, but would it be much more valuable than what we already have? We’d know a bit more about Agent Smith, and we’d know the identity of the person who did the legwork, but how would that help us? We’d also have a name of someone who purportedly provided the information from the Bulgarians, but how would that be of any use? Angov *908 could still complain that the IJ was unable to assess the Bulgarian official’s credibility, or even the credibility of any of the later links in the chain. We’d also know that it was Agent Smith who visually compared the seal on the subpoenas with the station’s official seal, but how does that bring us closer to the truth?
At this point, we would be faced with a whole new set of questions: How do we know Popov really went to the police station instead of stopping off in a bar to chug rakia? How did Popov know whether Bogdanovich was really the supervisor of personnel records at the police station? Did he check her identification papers? How did Popov assess Bogdanovich to be trustworthy, and how can we be sure he’s right? Did Popov look at the personnel records himself, or did he take Bogdano-vich’s word that the three officers never worked there? Can we be sure that Bog-danovich checked all the relevant records? Can we be sure the purported personnel records were accurate and complete? How do we know Popov didn’t falsify important details because he was afraid of reprisal or because he hates gypsies? And how can we be sure Smith is telling the truth if we can’t cross-examine him? Did Smith have a full-sized copy of the subpoena when he compared the seals or a shrunken photocopy?
These difficulties are inherent in trying to prove up facts related to events that occurred years past and thousands of miles away from where the IJ is holding his hearing. Short of transporting all the de-clarants and their underlying records to the United States for a hearing before an IJ, there will inevitably be gaps that can be bridged only by multiple levels of hearsay.
This is not a problem that plagues only the government. Almost every piece of evidence asylum petitioners present in support of their cases would be inadmissible if subjected to the rules of evidence, especially those pertaining to hearsay: threats they claim to have been subjected to; racist comments by the police; reports of strange people looking for them; letters from family members and others. A brief scan of our caselaw shows it’s pretty much impossible to build an asylum case without relying on evidence that would be laughed out of court if presented in a domestic trial. See, e.g., Meza-Vallejos v. Holder, 669 F.3d 920, 922 (9th Cir.2012); Haile v. Holder, 658 F.3d 1122, 1124-25 (9th Cir.2011); Singh v. Holder, 656 F.3d 1047, 1049-50 (9th Cir.2011); Hu v. Holder, 652 F.3d 1011, 1013-15 (9th Cir.2011); Kumar v. Gonzales, 444 F.3d 1043, 1047-48 (9th Cir.2006).
Take, as a small example, the letter from Daniela Mihaylova that Angov presented to rebut some of the information in the Bunton Letter. This is a two-page, typed document, with a small emblem and a typed address by way of letterhead. (We reproduce it in the Appendix.) It is addressed “To: Whom it may concern” and references Angov’s case. The letter represents that the “Romani Baht Foundation is a leading Bulgarian non-profit organization for protection of Roma/Gypsies human rights, founded in 1996 and legally registered with Bulgarian court.” Mihay-lova purports to be the legal programs’ director of the Foundation.
The BIA took this letter seriously and modified some of the IJ’s findings based on it and other evidence presented by An-gov. But there is absolutely no evidence in the record that there is any such person as Daniela Mihaylova and, if there is, how she went about obtaining the information detailed in her letter. For all we know, Angov could have printed the letter using his computer and standard word processing software.
*909 Compared to this letter — and the remaining evidence presented by Angov— the Bunton Letter seems a paragon of reliability. It was prepared by government officials trained to perform this kind of investigation; who have nothing to gain by giving false information; and whose conduct is clothed with the presumption of regularity that attaches to all government actors. Cf. Perales, 402 U.S. at 402-06, 91 S.Ct. 1420. The Bunton Letter encloses five photographs depicting locations mentioned in Angov’s asylum petition, which confirms that someone from our consulate traveled to those locations and made a personal inspection.
The Bunton Letter also gives specific reasons for doubting the authenticity of the addresses and points to several problems with the subpoenas. It is not an unsupported assertion that Angov is a liar; it is a rational, apparently objective recital of observed facts. At the very least, we can be sure that there is a Bunton and a Tongour, and that they can be disciplined or prosecuted if they negligently or deliberately falsified their reports. And we can reasonably presume that, in preparing their reports, Bunton and Tongour relied on trained State Department officers and agents who are themselves subject to discipline or prosecution for incompetence or corruption.
Compare this to the letter from Mihay-lova (assuming there even is a Mihaylova): It comes from someone who cannot be disciplined or prosecuted in case of a lie, and who has not been screened for competence, honesty or reliability. It encloses no pictures or other documentary evidence. It doesn’t explain how the facts asserted were gathered or by whom. It doesn’t even claim to be based on firsthand knowledge, rather than hearsay or rumor. The letter simply makes a series of bald factual assertions without any support. Even assuming the letter is genuine (in the sense that it was actually written by its purported signatory in Bulgaria), the IJ and the BIA have absolutely no way to evaluate how accurate or objective it is.
In an environment where it’s pretty much impossible to obtain first-hand accounts of most of the relevant facts, should we require the government to fight an uphill battle on a slippery slope with one leg and both arms tied behind its back, while its adversary gets to use cleats and brass knuckles? Of course not. It would be the height of cognitive dissonance to hold the United States to standards of proof derived from domestic litigation while allowing petitioners to present anything and everything that doesn’t bear the watermark “Forgery Purchased on the Black Market.”
Furthermore, contrary to what the dissent and the Second Circuit might believe, the consequence of a rule excluding the consideration of documents such as the Bunton Letter will not be to allow more of the world’s oppressed into the land of the free. Rather, it favors the canny, the dishonest, the brazen and those who have the means and connections to purchase or create fraudulent documents, such as Angov’s compatriot, Pavlov. See pp. 900-01 supra. Nor does such a rule ultimately help asylum seekers, as it’s hard to believe that Congress will long allow the program to continue when it rewards people who lie their way into the United States. Eventually, Congress and the public will catch on that asylum has become a fast-track vehicle for immigration fraud, and the asylum statute will be repealed or amended so as to make it even more difficult for honest asylum seekers to obtain relief. The ultimate victims will be the tired, poor, huddled masses who will find the golden door slammed in their faces.
* * *
*910 We conclude on this record that the IJ acted within his discretion when he admitted the Bunton Letter into evidence and relied on it to find that the subpoenas Angov submitted were fraudulent. The adverse credibility finding based on the fraudulent subpoenas was supported by substantial evidence. Because Angov’s claim is based on his mistreatment by the Bulgarian police, the fact that the subpoenas were fraudulent “goes to the heart of [Angov’s] claim of persecution.” See Rizk, 629 F.3d at 1087-88. Furthermore, An-gov’s testimony is not credible, and he doesn’t present other evidence that meets his burden to show that it’s “ ‘more likely than not’ ” that he would be tortured if sent back to Bulgaria. See Shrestha v. Holder, 590 F.3d 1034, 1048 (9th Cir.2010). Consequently, the IJ and BIA decisions denying Angov asylum, withholding of removal and protection under the Convention Against Torture must stand.
PETITION DENIED.
Appendix: Mihaylova Letter
[[Image here]]
*911 [[Image here]]

. Angov’s brief refers to him as “Roma” or "gypsy” interchangeably. So do we.

. 8 C.F.R. § 208.6(a) provides that "[ijnfor-mation contained in or pertaining to any asy *898 lum application ... shall not be disclosed without the written consent of the applicant.” Angov argues that Alexandrov "exposed the improprieties that have riddled overseas investigations in the Sofia consulate,” including that investigations were often conducted by foreign service nationals, that someone other than a consular officer could have authored embassy reports and that consular officials often signed reports written by others. None of these arguments were presented to the BIA.

. We note that four circuits have held that reliance on documents like the Bunton Letter in asylum proceedings violates due process. *899 See Banat v. Holder, 557 F.3d 886, 892-93 (8th Cir.2009); Anim v. Mukasey, 535 F.3d 243, 256-58 (4th Cir.2008); Alexandrov, 442 F.3d at 407; Ezeagwuna v. Ashcroft, 325 F.3d 396, 405-08 (3d Cir.2003). Because Angov does not have a constitutional right to procedural due process, that question is not before us. We also note that two other circuits have held that asylum applicants like Angov are entitled to certain "minimum due process" rights in the application of their statutory rights. See Marincas v. Lewis, 92 F.3d 195, 203-04 (3d Cir.1996); Augustin v. Sava, 735 F.2d 32, 37 (2d Cir.1984); see also Meachum v. Fano, 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Whether asylum applicants are owed such "minimum due process” is an open question in our circuit, but it is not one we need to resolve here. Angov was clearly given fair access to all his statutory rights. What he asks for instead are due process protections that go beyond those which Congress has provided him. But, as an alien who has never entered the United States, those protections are unavailable to him.