**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GURJEET SINGH NIJJAR,

*Petitioner,*

v.

ERIC H. HOLDER Jr., Attorney
General,

*Respondent.*

No. 07-74054

Agency No.
A073-416-442

PARAMJIT KAUR NIJJAR,

*Petitioner,*

v.

ERIC H. HOLDER Jr., Attorney
General,

*Respondent.*

No. 08-70933

Agency No.
A075-250-758

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 11, 2011—San Francisco, California

Filed August 1, 2012

Before: Proctor Hug, Jr., Andrew J. Kleinfeld, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Kleinfeld

8511

---

**COUNSEL**

Jaspreet Kalra Singh (argued), New York, New York, Jagdip Singh Sekhon (briefed), Oakland, California, for the petitioners.

Rosanne Perry, Department of Justice, Washington, DC, for the respondent.

---

**OPINION**

KLEINFELD, Senior Circuit Judge:

We address whether the Department of Homeland Security has authority to terminate an alien's asylum status, and conclude that it does not. The issue arises out of structural changes to our immigration system made when the Department of Homeland Security assumed functions of the Immigration and Naturalization Service.

**I.**

Petitioners, Gurjeet Singh Nijjar and his wife, Paramjit Kaur Nijjar, are natives and citizens of India. Mr. Nijjar applied for asylum in 1995, based on political persecution he claimed to have suffered in India from 1991 to 1994, on account of his being a Sikh and a supporter of Khalistan. He claimed this persecution caused him to flee India in 1994. The Immigration and Naturalization Service granted his asylum application in 1996. He brought his wife and son into the United States as derivative asylees in 1997.

A few years later, in 2003, our immigration and asylum system underwent a major restructuring. Prior to 2003, two agencies within the Department of Justice—the Immigration and Naturalization Service (INS)[1] and the Executive Office of Immigration Review (EOIR)[2]—handled asylum applications. On March 1, 2003, the INS ceased to exist.[3] Most of its functions were transferred to a new cabinet-level department, the Department of Homeland Security.[4] Various agencies within the Department of Homeland Security became responsible for the immigration functions previously administered by the INS. One of the new Department of Homeland Security agencies, the United States Citizenship and Immigration Services (USCIS),[5] administers asylum applications through its asylum

[1] In 1940, the INS was transferred from the Department of Labor to the Department of Justice. Reorganization Plan No. V of 1940, 5 Fed. Reg. 2223, ch. 231, § 1 (June 14, 1940), *reprinted in* 5 U.S.C. app. at 545 (2006), *and in* 54 Stat. 1238 (1940) (codified at 8 U.S.C. § 1551).

[2] The EOIR was created as a separate agency within the Department of Justice, effective February 15, 1983, through an internal reorganization which combined the Board of Immigration Appeals with the immigration judges, previously of the INS. Board of Immigration Appeals; Immigration Review Function; Editorial Amendments, 48 Fed. Reg. 8056-01 (Feb. 25, 1983); *see also* 8 C.F.R. §§ 1003.0(a)(1) (2011) ("Within the Department of Justice, there shall be an Executive Office for Immigration Review (EOIR), headed by a Director who is appointed by the Attorney General."), 1003.1 (Board of Immigration Appeals), 1003.10 (immigration judges)).

[3] Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 471, 1502, 116 Stat. 2135, 2205, 2308 (codified at 6 U.S.C. §§ 291, 542); Department of Homeland Security Reorganization Plan, H.R. Doc. No. 108-16 (2002), *set out as note under* 6 U.S.C. § 542.

[4] Homeland Security Act of 2002 §§ 441, 451, 116 Stat. at 2195 (codified at 6 U.S.C. §§ 251, 271). Functions under the immigration laws with respect to the care of unaccompanied alien minors transferred to the Department of Health and Human Services. *Id.* at § 462, 116 Stat. at 2202 (codified at 6 U.S.C. § 279).

[5] *Id.* at § 451, 116 Stat. at 2195 (codified at 6 U.S.C. § 271). The agency was originally called the Bureau of Citizenship and Immigration Services (BCIS). The Department of Homeland Security officially changed the name of BCIS to USCIS, effective August 23, 2004. Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services, 69 Fed. Reg. 60938-01 (Oct. 13, 2004). Both acronyms, BCIS and USCIS, continue to be used in the regulations.

officers.[6] The EOIR, which remains an agency of the Department of Justice, also continues to administer asylum applications, through immigration judges.[7]

On November 25, 2003, Mr. Nijjar was notified that the INS (although it no longer existed)[8] intended to terminate his asylum status for fraud. He had stated in his asylum application (under the name Gurjeet Singh Nijjar) that he was persecuted in India from 1991 to 1994. "INS information, however, indicate [sic] that you were in the United States continuously from September 1987 under the name Gurjit Singh." The letter instructed Mr. Nijjar to attend a termination interview with an asylum officer of the no longer existing INS on January 5, 2004, to respond to the allegation of fraud.

At Mr. Nijjar's request, the interview was rescheduled three times, but he neither appeared nor offered an excuse for not appearing. On November 29, 2004, the USCIS, of the Department of Homeland Security, sent Nijjar a "Termination Notice," informing him that his asylum status had been terminated by the USCIS.[9] No reason was given for the termination. Enclosed with the Termination Notice was a Notice to Appear, Form I-862, which placed Mr. Nijjar in removal pro-

---

[6] 8 C.F.R. § 208.9 (2011)

[7] 8 C.F.R. § 1208.2(b) (2011).

[8] The "Notice of Intent to Terminate Asylum Status" letter purported to be from the INS, of the Department of Justice, in both the letterhead and the text of the letter. The INS ceased to exist almost nine months earlier, on March 1, 2003. A nonexistent federal agency could not have issued the letter. Perhaps the USCIS, of the Department of Homeland Security, was using another cabinet department's old stationery and boilerplate language from its days as the INS.

[9] The Termination Notice stated: "The purpose of this letter is to notify you that US Citizenship and Immigration Services (USCIS) has terminated your asylum status, effective November 5, 2004."

ceedings. The Notice to Appear scheduled a hearing before an immigration judge.[10]

The problem that gives rise to this opinion is that Mr. Nijjar's "Termination Notice," the written notification that his asylum status had been terminated, came from the USCIS. He argues that the USCIS, within the Department of Homeland Security, did not have authority to terminate his asylum status, and that only the Attorney General has such authority. Nijjar moved to terminate the removal proceedings on the ground that his asylum status had not properly been terminated. The immigration judge concluded that she lacked jurisdiction to review an asylum officer's termination of asylum status. Since Nijjar had no right to be in the United States except as an asylee, and asylum status had been terminated, she ordered him removed to India. The only basis for his wife and son being in the United States was as derivative asylees of Mr. Nijjar, so they were also ordered removed.

On appeal, the Board of Immigration Appeals agreed that the immigration judge lacked jurisdiction to review the asylum officer's termination of Mr. Nijjar's asylum status. Since the termination stood, the immigration judge's order of removal was affirmed. Gurjeet and Paramjit Nijjar petition for

---

[10]Curiously, even though the Termination Notice came from the USCIS within the Department of Homeland Security, the Notice to Appear enclosed with the Termination Notice purported to be from the defunct INS. It ordered Mr. Nijjar to appear before an immigration judge, of the Department of Justice. The Notice to Appear is signed on behalf of the defunct INS by a "supervisory asylum officer," a position in the Department of Homeland Security, not the Department of Justice, on the date it was signed. Evidently the government, like Mr. Nijjar, had difficulty with consistency in identifying itself by the correct name. All we can figure out is that no one in the USCIS office thought to get stickers or rubber stamps correcting the anachronisms in the old stationery and forms, and the same people working in the same office but under the aegis of a new cabinet department were proceeding in the accustomed way, using the same boilerplate language in letters that had been used when they worked for the INS.

review. We have jurisdiction over the Nijjars' petitions under 8 U.S.C. § 1252.

## II.

The oddities about the government stationery used for the several letters and forms sent to Mr. Nijjar make the case something of a morass, if the words in these documents are taken literally. We assume for purposes of decision that the forms purporting to come from the defunct INS within the Department of Justice actually came from the USCIS within the Department of Homeland Security. We make this assumption because nothing else makes any sense. The communication that matters, the "Termination Notice" that terminated Mr. Nijjar's asylum status, is on the letterhead of an existing agency, USCIS, Department of Homeland Security.

There are two regulations addressing the termination of asylum status, 8 C.F.R. §§ 208.24 and 1208.24. The latter, a duplication of the former, was promulgated by the Department of Justice on February 28, 2003, one day before the INS ceased to exist, since with the creation of the Department of Homeland Security, asylum would now be administered by agencies in two cabinet departments, instead of one.[11] The duplication of regulations was intended to be a "temporary measure," "interim in nature."[12] Nearly a decade later, however, the regulations governing asylum termination have not been substantively changed, and are identical to the regulation that existed when asylum was handled by agencies in just one cabinet department (the INS and EOIR in the Department of Justice).

---

[11]Aliens and Nationality, Homeland Security, Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003) (codified at 8 C.F.R. pts. I, V).

[12]*Id.* at 9825 (stating that the duplication of regulations, and division of authority, "should be understood as a temporary measure to ensure continuity," and that "further division and elimination of a substantial number of sections is expected in the near future").

**[1]** The regulations provide that authority to terminate asylum is accorded to the same office that granted asylum. The regulations state: "an asylum officer [of the USCIS] may terminate a grant of asylum . . . if following an interview, the asylum officer determines that: (1) There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted."[13] The regulations also state that when asylum status is terminated, the USCIS "shall initiate removal proceedings."[14] And that is what was done with Mr. Nijjar. The USCIS placed him in removal proceedings after it terminated his asylum status. So far, all the procedural steps are in accord with the regulations.

During removal proceedings, the immigration judge held that she lacked jurisdiction to review the asylum officer's termination of asylum status for fraud. That determination was based on the language in 8 C.F.R. § 208.24, which states that "an asylum officer may terminate a grant of asylum," and on the absence of any regulation providing for review of such a

---

[13]8 C.F.R. § 208.24 (2004):

> (a) Termination of asylum by the Service. Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that:

> (1) There is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted;
> . . . .

The "Service" is defined by regulation to refer to the INS prior to March 1, 2003 and to USCIS after that date. 8 C.F.R. § 1.1(c) (2004).

[14]8 C.F.R. § 208.24(e) (2004):

> Removal proceedings. When an alien's asylum status or withholding of removal or deportation is terminated under this section, the Service shall initiate removal proceedings, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings. Removal proceedings may take place in conjunction with a termination hearing scheduled under § 208.24(f).

termination by the immigration judge in removal proceedings or otherwise. The Board of Immigration Appeals affirmed. The Third Circuit in *Bhargava v. Attorney General*, held that this view of jurisdiction was a correct interpretation of the regulation, because both the regulation and the statute "are silent with respect to an immigration judge's jurisdiction to review a termination of asylum by DHS."[15] The Fifth Circuit in *Qureshi v. Holder*,[16] following *Bhargava*, held that "[n]either the IJ nor the BIA has authority to review USCIS's decision to terminate asylum," though the asylee may obtain review of questions of law (but not fact) underlying the termination.[17] *Qureshi* in dictum also says that the alien may make a new application for asylum.[18] Not addressed in *Qureshi* is that this hypothetical second asylum application would ordinarily be time-barred,[19] quite aside from whatever negative implication the fraud determination would have on the applicant's credibility in his second attempt to obtain asylum.

**[2]** At this point, the answer to the question posed by this case is to deny the petition, citing *Bhargava* and *Qureshi*. But so far, all we have looked at are the regulations. We also have to ask where the asylum officer, of the USCIS, of the Department of Homeland Security, got its authority to terminate asylum status. And that is where we run into an insuperable problem. Congress did not confer the authority to terminate asylum on the Department of Homeland Security. Congress conferred that authority exclusively on the Department of Justice.

---

[15]*Bhargava v. Attorney General of the U.S.*, 611 F.3d 168, 170 (3d Cir. 2010).

[16]*Qureshi v. Holder*, 663 F.3d 778 (5th Cir. 2011).

[17]*Id.* at 780.

[18]*Id.* at 780-81.

[19]8 U.S.C. § 1158(a)(2)(B) (providing that absent materially changed or extraordinary circumstances, an alien may not apply for asylum "unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States").

**[3]** Congress expressly provided that "the Secretary of Homeland Security *or* the Attorney General may *grant* asylum . . . ."[20] But the subsection governing termination of asylum is not parallel, and does not say that either cabinet department may terminate asylum. The "termination of asylum" subsection of the statute says that asylum "may be terminated if the Attorney General determines" that any of several conditions are met.[21]

---

[20]8 U.S.C. § 1158(b)(1)(A) (emphasis added) ("The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section . . . .").

[21]8 U.S.C. § 1158(c)(2) states:

Termination of asylum

Asylum granted under subsection (b) of this section does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

(A) the alien no longer meets the conditions described in subsection (b)(1) of this section owing to a fundamental change in circumstances;

(B) the alien meets a condition described in subsection (b)(2) of this section;

(C) the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

(E) the alien has acquired a new nationality and enjoys the protection of the country of his or her new nationality.

**[4]** Fraud in the application is not mentioned explicitly, but is one of the "additional limitations . . . under which an alien shall be ineligible for asylum" that the Attorney General is authorized to establish by regulation.[22] It is difficult to imagine that Congress left cabinet departments free to compete with each other and grab whatever authority they like. It is even more difficult to imagine that Congress intended so important a determination as terminating asylum status for fraud to be an unreviewable decision, made by an officer below the level of, and without the independence of, an immigration judge, on the basis of an informal interview.[23]

*Chevron* and other forms of deference[24] to the agency have no application here, because Congress did not confer discretion on the Department of Homeland Security to issue regulations or interpret the statute insofar as it addresses termination of asylum. Congress said that termination of asylum is within the authority of the "Attorney General." True, the regulations issued by the Department of Justice say that the asylum officer may also terminate asylum, but the statute says otherwise.

---

[22]8 U.S.C. § 1158(b)(2)(C) ("Additional limitations. The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."); *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.").

[23]*See Barahona-Gomez v. Reno*, 236 F.3d 1115, 1120-21 (9th Cir. 2001) (explaining significance of procedural distinctions between the "quasi-prosecutorial" "informal conferences conducted by asylum officers" and the "quasi-judicial functions" exercised by immigration judges who preside over hearings in which "[t]estimony of witnesses is taken under oath at a transcribed hearing"); *see also Singh v. Gonzalez*, 403 F.3d 1081, 1087-88 (9th Cir. 2005) (explaining that an interview with an asylum officer may be conducted without an oath and without a USCIS-provided interpreter).

[24]*See, e.g., Auer v. Robbins*, 519 U.S. 452, 462-63 (1997); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944).

We cannot apply *Chevron* deference when "Congress has directly spoken to the precise question at issue."[25] "If the intent of Congress is clear, that is the end of the matter."[26] Congress spoke directly to the precise question of who can terminate asylum, making its intent clear: "the Attorney General."[27] That is, under *Chevron*, indeed the end of the matter. When Congress assigns authority to one cabinet department, that department is not free to reverse the congressional determination by assigning it to another.[28]

A subsequent amendment of the statute makes congressional intent especially clear in this case. Congress amended 8 U.S.C. § 1158 in the REAL ID Act, carefully distinguishing authority for grants from authority for terminations of asylum.[29] Before the creation of the Department of Homeland Security, the statute authorized only the Attorney General to both grant and terminate asylum status.[30] Then, in 2005, effective retroactively to March 1, 2003,[31] Congress amended 8 U.S.C. § 1158(b)(1), the provision for *granting* asylum. The amendment for *granting* asylum changed "the Attorney General" to

---

[25]*Chevron*, 467 U.S. at 842.

[26]*Id.* at 843; *see also Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc) ("Congressional intent may be determined by traditional tools of statutory construction, and if a court using these tools ascertains that Congress had a clear intent on the question at issue, that intent must be given effect as law.") (internal quotation marks omitted), *amended by* 360 F.3d 1374 (9th Cir. 2004).

[27]8 U.S.C. § 1158(c)(2).

[28]*Cf. Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (holding congressional delegation "constitutionally sufficient if Congress clearly delineates the general policy, *the public agency which is to apply it*, and the boundaries of this delegated authority") (emphasis added) (internal quotation marks omitted).

[29]REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, 302-03, § 101(a)(1), (2).

[30]8 U.S.C. §§ 1158(b)(1), (c)(2) (2002).

[31]REAL ID Act of 2005, § 101(h)(1), 119 Stat. at 305 ("The amendments . . . shall take effect as if enacted on March 1, 2003.").

"The Secretary of Homeland Security *or* the Attorney General," ratifying what the Department of Homeland Security had been doing since 2003.[32] Though Congress in this curative amendment conferred additional authority on the Department of Homeland Security in several respects, it left authority to terminate asylum exclusively with the Attorney General. The new law added the Department of Homeland Security to subsection (b)(1), for granting, but not subsection (c)(2), for terminating, asylum. This termination section still confers authority only on "the Attorney General."

About all the government has to say regarding this issue of authority in its brief is that the regulation clearly authorizes the asylum officer to terminate asylum. Indeed it does, but the government offers no reading of the statute that would authorize the Department of Homeland Security to promulgate that regulation. At oral argument, the government offered two additional theories: that what the Department of Homeland Security can grant it implicitly can take away, and that the congressional failure to include the Department of Homeland Security in subsection (c)(2) was an "oversight."

The first argument—"what we can give, we can take away" —is euphonious but not logical. Popular songs are full of euphonious lyrics that make false statements, such as the Beatles' lyrics:

> There's nothing you can know that isn't known
> Nothing you can see that isn't shown
> Nowhere you can be that isn't where you're meant
> to be[33]

---

[32]REAL ID Act of 2005, § 101(a), (h)(1), 119 Stat. at 303 (codified at 8 U.S.C. § 1158(b)) (emphasis added).

[33]The Beatles, *All You Need is Love*, on Magical Mystery Tour (EMI/Capitol 1967).

We held in *Gorbach v. Reno* that "[t]here is no general princi-
ple that what one can do, one can undo."[34] There, Congress
conferred authority on the Attorney General to give natural-
ization, but only on the District Court to take it away.[35] Here,
Congress conferred authority on both the Attorney General
and the Department of Homeland Security to give asylum, but
only on the Attorney General to take it away.

The second argument amounts to a claim of scrivener's
error by Congress, corrected by the regulation. The statutory
language though, looks more like congressional reliance on
our application of *expressio unius est exclusio alterius*[36] than
a mistake. The amendment by the REAL ID Act carefully
delineates exactly where to substitute "the Secretary of Home-
land Security or the Attorney General" for "the Attorney Gen-
eral." Illogicality can be evidence that congressional intent is
contrary to the apparent plain meaning of the words,[37] but
there is no logical problem with assigning power to grant asy-
lum to two departments but the power to take it away to only
one. "[W]e begin with the understanding that Congress 'says
in a statute what it means and means in a statute what it says
there.' "[38] "[W]hen 'the statute's language is plain, the sole

---

[34]*Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc).

[35]*Id.*

[36]*See ARC Ecology v. U.S. Dep't of the Air Force*, 411 F.3d 1092,
1099-1100 (9th Cir. 2005) ("[T]he doctrine of *expressio unius est exclusio
alterius . . .* teaches that omissions are the equivalent of exclusions when
a statute affirmatively designates certain persons, things, or manners of
operation."); *see also* 2A Norman J. Singer & J.D. Shambie Singer, *Suth-
erland's Statutes & Statutory Construction* § 47:23 (7th ed. 2007)
("Where a statute creates and regulates, and prescribes the mode and
names the parties granted right to invoke its provisions, that mode must
be followed and none other, and such parties only may act.").

[37]*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S.
439, 462 (1993); *Amalgamated Transit Union Local 1309 v. Laidlaw
Transit Servs., Inc.*, 435 F.3d 1140, 1146 (9th Cir. 2006), rehearing en
banc denied, 448 F.3d 1092 (9th Cir. 2006).

[38]*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530
U.S. 1, 6 (2000) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254
(1992)).

function of the courts'—at least where the disposition required by the text is not absurd—'is to enforce it according to its terms.' "**³⁹** Here, the statute is plain and not absurd.

In *Amalgamated Transit Union*, where Congress said an appeal could be taken "not *less* than 7 days" after the order but at any time thereafter, we cured the illogical result caused by the scrivener's error by reading "less" to mean "more."**⁴⁰** Here, if we could think of no reason why Congress might have meant what it said in assigning authority to terminate asylum only to the Attorney General, construction of the statute would present a closer question. But a sensible congressional purpose is obvious. Grants of asylum are presumably far more frequent than terminations,**⁴¹** so granting two departments authority and leeway to structure these grants addresses a volume problem.**⁴²** Terminations of asylum are grave enough so that Congress might sensibly intend just what it did, assigning the authority to the Attorney General, where a neutral arbiter, the immigration judge, rather than an asylum officer, would make the decision, and where the decision would be subject to appeal to the Board of Immigration Appeals, rather than being unappealable. That would be con-

---

**³⁹***Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

**⁴⁰***Amalgamated Transit Union*, 435 F.3d at 1145 (emphasis added).

**⁴¹***Cf. Gorbach*, 219 F.3d at 1095-96.

**⁴²***See* Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization, 59 Fed. Reg. 62,284-01 (Dec. 5, 1994) (codified at 8 C.F.R. § 208) (amending regulations to "streamline the asylum adjudications process by making several principal reforms. First, the role and functions of asylum officers would change to allow the officers to address a greater volume of applications and to concentrate their efforts on approving meritorious claims. Asylum officers would no longer deny applications from persons who are excludable or deportable, but instead would refer such cases directly to an immigration judge for adjudication. The original application also would be forwarded to the immigration judge to form part of the record of proceedings.").

sistent with the procedure for when an asylum officer denies an application for asylum status, and must refer the denied application for asylum to an immigration judge for de novo consideration,[43] subject to appeal.[44] Reading the statute to mean what it says makes termination procedure parallel to denial procedure. Reading the statute as the government urges not only conflicts with its plain meaning but also creates an unfair anomaly. We can think of no reason why Congress would give an alien more procedural protection when his asylum application is denied in the first instance, than when his asylum status is granted but subsequently taken away.

[5] Congress has provided one way for asylum status to terminate: through the Attorney General. There is no statutory authorization for a second way. The regulations pursuant to which the Department of Homeland Security terminates asylum status, 8 C.F.R. § 208.24(a) and 8 C.F.R. § 1208.24(a), are *ultra vires* because the governing statute, 8 U.S.C. § 1158(c)(2), confers that authority exclusively on the Attorney General.

The Nijjars' petitions for review of the BIA's orders of removal are GRANTED, and the case is REMANDED for further proceedings consistent with this opinion.

---

[43]8 C.F.R. § 208.14(c) ("If the asylum officer does not grant asylum to an applicant . . . the asylum officer shall deny, refer, or dismiss the application, as follows: (1) . . . in the case of an applicant who appears to be inadmissible or deportable . . . the asylum officer shall refer the application to an immigration judge . . . for adjudication in removal proceedings . . . ."); *see also Singh v. Gonzalez*, 403 F.3d 1081, 1086 n.2 (9th Cir. 2005) ("Singh's asylum interview [with the asylum officer] could not have led to a denial of asylum, but rather resulted in the referral of his application to the IJ for a de novo hearing.").

[44]8 C.F.R. § 1003.1(b)(9).