**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELEN GRIGORYAN; SIRUN
HARUTYUNYAN; ARTAVAZD
GRIGORYAN; KAREN
GRIGORYAN,
　　　　　　　　*Petitioners*,

　　　　　　v.

WILLIAM P. BARR, Attorney
General,
　　　　　　　　*Respondent.*

No. 16-73652

Agency Nos.
A075-748-697
A079-275-042
A079-275-043
A079-275-044

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted November 7, 2019
Pasadena, California

Filed June 2, 2020

Before: Mary H. Murguia and Andrew D. Hurwitz, Circuit
Judges, and Jack Zouhary,* District Judge.

Opinion by Judge Murguia

---

　　*The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

**SUMMARY**[**]

**Immigration**

Granting a petition for review of a Board of Immigration Appeals decision, and remanding, the panel held that the government violated petitioners' due process rights by failing to provide them a full and fair opportunity to rebut the government's fraud allegations before terminating their asylum status.

The panel first rejected petitioners' argument that the immigration judge lacked jurisdiction to terminate their asylum status. The panel explained that although Congress conferred exclusively on the Attorney General the authority to terminate asylum, the federal regulations specifically contemplate that an IJ may terminate asylum after notice is provided by DHS, and petitioners did not point to any statutory proscription of this notice requirement and regulatory framework. Because the government provided sufficient notice of the fraud allegations and request to terminate asylum, the panel concluded that the IJ had jurisdiction.

The panel next held that despite having authority to terminate petitioners' asylum status, the government did not afford petitioners due process in doing so. The panel concluded that the IJ's admission of, and reliance on, a Record of Investigation (ROI), was fundamentally unfair and did not comport with constitutional due process, because

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

it did not provide petitioners with sufficient information about the fraud investigation, and thus failed to afford petitioners a meaningful opportunity to rebut its allegations. The panel explained that the single-page ROI referred to unnamed investigators and "exemplars" of documents that purportedly confirmed that some of the asylum application materials were fraudulent, but did not identify any of the named individuals, present supporting evidence to explain the nature of the investigation, produce the referenced exemplars, or proffer any government witnesses about the alleged fraud. In addition, the panel stated that the ROI's indicia of reliability were further undermined because, notwithstanding their limited ability to rebut the report's findings, petitioners were nonetheless able to show that half of the identified documents were not fraudulent. The panel stated that the mere fact that the ROI is a DHS document does not absolve the government from affording petitioners a fair opportunity to rebut its assertions.

Lastly, the panel held that petitioners were prejudiced by the admission and consideration of the ROI, where the ROI was the only evidence DHS introduced to support its fraud allegations, the Board accorded it "considerable weight," and the government conceded at oral argument that without admission of the ROI, fraud was not established by a preponderance of the evidence.

The panel vacated the Board's decision and the IJ's order of removal, and remanded for the Board to conduct further proceedings consistent with this opinion.

## COUNSEL

Catalina Gracia (argued), Law Office of Catalina Gracia, Los Angeles, California; Areg Kazaryan, Law Offices of Areg Kazaryan, Glendale, California; for Petitioners.

Sherease Rosalyn Pratt (argued), Senior Litigation Counsel; S. Nicole Nardone, Trial Attorney; Anthony P. Nicastro, Assistant Director; Office of Immigration Litigation, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

MURGUIA, Circuit Judge:

Our government granted asylum to Karen Grigoryan ("Petitioner"), his wife, and two of their children (collectively, the "Grigoryans") in 2001. Beginning in 2005, the Grigoryans were subjected to a protracted immigration ordeal triggered by the government's allegations of fraud in Petitioner's asylum application. The Grigoryans' bureaucratic nightmare culminated when, after they had resided in the United States for nearly fourteen years, an immigration judge ("IJ") terminated their asylum status, denied their renewed requests for deportation relief, and ordered them removed to Armenia.

The IJ terminated the Grigoryans' asylum status by relying almost exclusively on a single-page "report" introduced by the Department of Homeland Security ("DHS") that purportedly revealed that Petitioner's original asylum application contained fraudulent documents. Although the Grigoryans were not allowed to examine any

of the documents or the individuals referred to in the report, they ultimately proved that half of the fraud allegations in the report were unfounded.  The IJ also relied on adverse credibility findings entered against Petitioner at an earlier hearing that never should have taken place.  The question before us is whether, in light of this series of missteps, the agency erred in terminating the Grigoryans' asylum status.

We have jurisdiction over the Grigoryans' petition for review pursuant to 8 U.S.C. § 1252.  We hold that the government violated the Grigoryans' due process rights by failing to provide them a full and fair opportunity to rebut the government's fraud allegations at the termination hearing.  We therefore grant the petition, vacate the decision by the Board of Immigration Appeals ("BIA") and the IJ's order of deportation, and remand to the BIA for further proceedings consistent with this opinion.

## I.

Petitioner was granted asylum by the now-defunct Immigration and Naturalization Service ("INS")[1] in

---

[1] Congress significantly restructured our immigration system in 2003.  As we explained in *Nijjar v. Holder*:

> Prior to 2003, two agencies within the Department of Justice—the Immigration and Naturalization Service (INS) and the Executive Office of Immigration Review (EOIR)—handled asylum applications.  On March 1, 2003, the INS ceased to exist.  Most of its functions were transferred to a new cabinet-level department, the Department of Homeland Security.  Various agencies within the Department of Homeland Security became responsible for the immigration functions previously administered by the INS.  One of the new Department of Homeland Security agencies,

February 2001 on the basis that he was persecuted in Armenia because of his association with the People's Party of Armenia. Petitioner's wife and two of their children were later admitted into the United States as asylees following-to-join. Petitioner has a third child who is a minor born in the United States.

## A. 2005 Asylum Termination by USCIS

Four years after the INS's grant of asylum, in January 2005, the United States Citizenship and Immigration Services ("USCIS") served Petitioner with a Notice of Intent to Terminate Asylum Status. The notice claimed that a USCIS investigation revealed that certain documents Petitioner submitted in support of his asylum application were fraudulent and, therefore, he was not eligible for asylum. The notice also asked Petitioner to appear for a scheduled interview to "present information and evidence to show that [he was] still eligible for asylum." The notice did not otherwise describe the nature of the investigation or the purportedly fraudulent documents.

Following Petitioner's interview, USCIS served him with a Notice of Termination of Asylum Status. That notice informed Petitioner that the agency had terminated his asylum status—and, consequently, the derivative asylum

the United States Citizenship and Immigration Services (USCIS), administers asylum applications through its asylum officers. The EOIR, which remains an agency of the Department of Justice, also continues to administer asylum applications, through immigration judges.

689 F.3d 1077, 1078–79 (9th Cir. 2012) (footnotes omitted).

status of his wife and children—because of "fraud in [his] application for asylum."

## B. 2011 Order of Removal by the IJ

Once USCIS revoked the Grigoryans' asylum status, DHS served them with Notices to Appear ("NTAs") on the basis that they were without authority to remain in the United States.[2] Petitioner then sought asylum anew, with his wife and children as derivatives. He also sought withholding of removal and protection under the Convention Against Torture ("CAT").

Petitioner appeared before the IJ on three occasions in August and September of 2010—over nine years after his original asylum grant—to testify in support of his renewed application for asylum. During these hearings, Petitioner testified primarily about his past persecution in Armenia, since he bore the burden of proving that he was entitled to relief from deportation.

At the request of DHS, and over Petitioner's objection, the IJ admitted into evidence a one-page March 2008 Report of Investigation ("ROI") produced by DHS. The ROI stated that, on August 8, 2006 (a year after USCIS revoked the Grigoryans' asylum status), "USCIS-Moscow received a request from [an individual named] Rachel Ruane, ACC Los Angeles, to open an investigation of several documents issued to [Petitioner]," and that "USCIS-Moscow forwarded this request to local investigators at the US Embassy in Yerevan." The ROI also listed four documents that unnamed

---

[2] The NTAs served on the Grigoryans are on INS letterhead. Because the INS no longer existed, *see supra* n.1, we assume DHS served the NTAs. "We make this assumption because nothing else makes any sense." *Nijjar*, 689 F.3d at 1080.

local investigators suspected of being altered or fraudulent based on "exemplars" of those documents.**3** The ROI further indicated that there were no "fraud indicators" as to Petitioner's membership card and certificate from the "People's Party of Armenia." The Grigoryans were not provided any of the referenced exemplars or afforded an opportunity to cross-examine any of the individuals referenced in the ROI or government witnesses.**4**

In August 2011, the IJ denied the Grigoryans' renewed applications for asylum, withholding of removal, and CAT relief and ordered them deported. The IJ acknowledged that Petitioner had shown that at least two of the documents identified by DHS in the ROI were neither fraudulent nor altered. The IJ also acknowledged that Petitioner had no opportunity to cross-examine the preparer of the ROI and that the report's findings "lack detail." The IJ further noted that Petitioner offered additional documents to corroborate his asylum claim—which DHS acknowledged were not fraudulent—and that Petitioner "testified that he did not personally obtain any of the documents which the Court [] found to be fraudulent, indicating that he may not have known that the documents were fraudulent." Nonetheless,

---

**3** The ROI identifies the four documents as "[t]he letter from the Ministry of Defense," "[t]he NGO registration document," "[t]he document from the Ministry of Justice," and a document from a hospital in Armenia.

**4** The ROI raises serious questions about the timing of the government's report and investigation. Although USCIS terminated the Grigoryans' asylum due to the allegedly fraudulent documents in August 2005, the ROI suggests that the government opened its investigation into Petitioner's asylum application documents a year later, in August 2006. In addition, the ROI is dated March 2008—approximately two and a half years after USCIS terminated the Grigoryans' asylum status.

the IJ relied on the ROI in denying Petitioner's applications, concluding that the report was "fundamentally fair" and "probative to [Petitioner's] claim as well as to his credibility because it discusses documents [Petitioner] submitted which go to the heart of his asylum claim." Based on the two documents in the ROI that Petitioner was unable to rebut, and on certain inconsistencies, omissions, and non-responsive answers provided by Petitioner during his 2010 hearings, the IJ found him not credible. Therefore, the IJ found the Grigoryans ineligible for relief from deportation and ordered them removed to Armenia. The BIA upheld the IJ's decision and dismissed the appeal.

## C. *Nijjar* **and Reopening of Proceedings**

Shortly after the BIA's decision, we held in *Nijjar* that the regulations authorizing USCIS to terminate asylum, 8 C.F.R. §§ 208.24(a), 1208.24(a), "are *ultra vires* because the governing statute, 8 U.S.C. § 1158(c)(2), confers that authority exclusively on the Attorney General." 689 F.3d at 1085–86. In light of *Nijjar*, the Grigoryans moved to reopen their case, arguing that USCIS had unlawfully terminated their asylum status in 2005. The BIA granted the motion and remanded the case to the same IJ who had conducted the prior proceedings.

On remand, the Grigoryans moved to terminate the removal proceedings, arguing that DHS never had the authority to terminate their asylum status and initiate the removal proceedings. In the alternative, they again requested asylum, withholding of removal, and CAT protection. The government opposed the motion to

terminate proceedings and cross-moved to terminate the
Grigoryans' asylum status.**[5]**

## D.  2015 Asylum Termination by the IJ

On February 9, 2015—fourteen years after the
Grigoryans were originally granted asylum—the IJ, without
conducting an evidentiary hearing, granted DHS's motion to
terminate the Grigoryans' asylum status and denied the
Grigoryans' motion to terminate removal proceedings and
renewed applications for asylum, withholding of removal,
and CAT relief.  The Grigoryans were again denied an
opportunity to cross-examine any government witnesses or
inspect the exemplars referenced in the ROI.

The IJ found that termination was warranted because
DHS "established by a preponderance of the evidence that
[Petitioner] committed multiple instances of fraud in his
asylum application," again giving "considerable weight to
the findings from the ROI."  Moreover, relying on her prior
adverse credibility determination from 2011, and on
Petitioner's inability to fully address or rebut the
government's fraud allegations, the IJ found unconvincing
Petitioner's claim that he did not know of the fraudulent
nature of the documents.  The IJ reasoned that Petitioner had
sworn to the veracity of his asylum application, yet the ROI

---

**[5]** DHS's motion attached the ROI, USCIS's 2005 Notice of Intent to
Terminate Asylum Status, and a Form I-261 titled "Additional Charges
of Inadmissibility/ Deportability" that alleged, among other things, that
Petitioner's "asylum claim was fraudulent in that documents [he]
submitted as corroborating evidence of [his] role and membership in the
PPA Youth Party [were] found to be false and other issues," and that
"[o]n August 19, 2005, USCIS issued this Notice to Appear to permit the
Attorney General to determine whether to terminate the prior grant of
asylum by USCIS."

showed the documents were fraudulent. Therefore, the IJ concluded, DHS established by a preponderance of the evidence that Petitioner knew the documents were false and intended to deceive the government. The IJ reiterated that the documents identified as fraudulent in the ROI went "to the very heart of [Petitioner's] asylum claim." Based on these findings, the IJ terminated the Grigoryans' asylum status.

Finally, the IJ concluded that the Grigoryans were removable because they no longer had asylum. Therefore, she denied the Grigoryans' renewed applications for asylum, withholding of removal, and CAT relief, and ordered them removed to Armenia.

The BIA subsequently dismissed the Grigoryans' appeal. As a threshold matter, the BIA held that the IJ had jurisdiction to terminate the Grigoryans' asylum status, despite the improper original asylum termination by USCIS. The BIA then concluded that the IJ did not err in finding that DHS established fraud by a preponderance of the evidence. The BIA reasoned that the IJ properly admitted and accorded "considerable weight" to the ROI, which showed fraud in Petitioner's application, and that the allegedly fraudulent documents "[went] to the heart" of Petitioner's claim.[6] Finally, the BIA affirmed the IJ's decision to deny asylum, withholding of removal, and CAT relief. This petition for review followed.

---

[6] As part of its decision to terminate asylum, the BIA cited to *Matter of P-S-H-*, 26 I. & N. Dec. 329, 333–36 (BIA 2014), which held that DHS does not need to prove that the individual knew of the fraud in the application. Accordingly, the BIA did not appear to adopt any of the IJ's findings regarding Petitioner's knowledge about the fraudulent nature of the documents.

## II.

"On review from a decision to terminate asylum status, this Court reviews the BIA's factual findings for substantial evidence," and "[q]uestions of law are reviewed de novo." *Urooj v. Holder*, 734 F.3d 1075, 1077–78 (9th Cir. 2013) (citing *Brezilien v. Holder*, 569 F.3d 403, 411 (9th Cir. 2009)). We review de novo claims of "due process violations in removal proceedings." *Cruz Rendon v. Holder*, 603 F.3d 1104, 1109 (9th Cir. 2010) (citing *Sandoval-Luna v. Mukasey*, 526 F.3d 1243, 1246 (9th Cir. 2008) (per curiam)).

## III.

The Grigoryans challenge the BIA's decision on four grounds: (1) the IJ lacked jurisdiction to revoke their asylum status; (2) DHS did not meet its burden of establishing fraud by a preponderance of the evidence; (3) the government violated the Grigoryans' due process rights; and (4) the BIA erred in denying the Grigoryans' renewed applications for asylum, withholding of removal, and CAT relief. We hold that, although the IJ had jurisdiction to terminate the Grigoryans' asylum status, the government violated their due process rights in doing so. Because the agency did not properly terminate the Grigoryans' asylum status, we need not address whether the IJ erred in denying the Grigoryans' renewed request for asylum, withholding of removal, and CAT relief.

### A. Jurisdiction

Relying on our decision in *Nijjar*, the Grigoryans claim that DHS did not have authority to trigger termination proceedings by issuing a Notice of Intent to Terminate

Asylum Status to Petitioner, because that authority is reserved for the Attorney General.

The Grigoryans misread *Nijjar*.  In that case, we held that Congress conferred the authority to terminate asylum exclusively on the Attorney General.  *Nijjar*, 689 F.3d at 1085–86.  It does not follow, however, that DHS may not request such termination by an IJ.  Indeed, federal regulations specifically contemplate that an IJ may terminate asylum after notice is provided by DHS.  *See* 8 C.F.R. §§ 208.24(f), 1208.24(f); *see also Urooj*, 734 F.3d at 1077 (evaluating whether DHS met its burden of proving fraud to terminate asylum, where DHS provided Notices to Appear and Notices of Intent to Terminate Asylum Status to the petitioners, and the IJ terminated the petitioners' asylum status).  The Grigoryans do not point to any statutory proscription of this notice requirement and regulatory framework.[7]

Consistent with federal regulations, DHS provided Petitioner notice and the IJ adjudicated the asylum termination.  DHS also served the Grigoryans with NTAs and amended Petitioner's NTA with allegations of fraud in Petitioner's asylum application and a request that the IJ determine whether termination of asylum was warranted. We therefore find no error in the BIA's decision that the IJ had jurisdiction.

---

[7] The Grigoryans do not dispute that the IJ—as opposed to USCIS— may terminate their asylum status if there was fraud in Petitioner's application.  *See Nijjar*, 689 F.3d at 1082 ("Fraud in the application is not mentioned explicitly [in the INA], but is one of the 'additional limitations . . . under which an [individual] shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation." (quoting 8 U.S.C. § 1158(b)(2)(C))).

## B.  Due Process

Even though the IJ had the authority to terminate the Grigoryans' asylum status, we conclude that the government did not afford the Grigoryans due process.  "The right to a fair hearing derives from the Due Process Clause of the Fifth Amendment, which applies in removal proceedings." *Cinapian v. Holder*, 567 F.3d 1067, 1074 (9th Cir. 2009) (citing *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000)). The Grigoryans—who underwent a rigorous screening process resulting in their admission into our country—must be afforded "the full panoply of procedural due process protections" under the Constitution, *Angov v. Lynch*, 788 F.3d 893, 898 (9th Cir. 2015), and "may be expelled only after proceedings conforming to traditional standards of fairness," *id*. (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).  Due process requires "a full and fair hearing," *Colmenar*, 210 F.3d at 971, which, at a minimum, includes a reasonable opportunity to present and rebut evidence and to cross-examine witnesses, *see Cinapian*, 567 F.3d at 1073–74; *Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 681–82 (9th Cir. 2005).

"To prevail on a due process challenge to deportation proceedings, [the Grigoryans] must show error and substantial prejudice." *Lata v. INS*, 204 F.3d 1241, 1246 (9th Cir. 2000) (citing *Getachew v. INS*, 25 F.3d 841, 845 (9th Cir. 1994)).  The Grigoryans thus "must demonstrate that the challenged proceeding 'was so fundamentally unfair that [they were] prevented from reasonably presenting [their] case.'" *Cruz Rendon*, 603 F.3d at 1109 (quoting *Colmenar*, 210 F.3d at 971).  Substantial prejudice is established when "the outcome of the proceeding may have been affected by the alleged violation." *Colmenar*, 210 F.3d at 971.

Here, the IJ's admission of, and reliance on, the ROI was fundamentally unfair and did not comport with constitutional due process. The report did not provide sufficient information about the fraud investigation, and the Grigoryans were not afforded a meaningful opportunity to rebut its allegations. *See, e.g.*, *Banat v. Holder*, 557 F.3d 886, 891–93 (8th Cir. 2009); *Anim v. Mukasey*, 535 F.3d 243, 256–62 (4th Cir. 2008); *Alexandrov v. Gonzales*, 442 F.3d 395, 407 (6th Cir. 2006); *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405–08 (3d Cir. 2003).

The single-page ROI refers to unnamed investigators and "exemplars" of documents that purportedly confirm that some of Petitioner's asylum application materials are fraudulent. However, DHS did not identify any of the named individuals, present supporting evidence to explain the nature of the investigation, produce the referenced exemplars, or proffer any government witnesses about the alleged fraud. Thus, the Grigoryans were not allowed a meaningful opportunity to rebut the government's fraud allegations. *See Banat*, 557 F.3d at 891 ("Reliance on reports of investigations that do not provide sufficient information about how the investigation was conducted are fundamentally unfair" and do not comport with due process "because, without that information, it is nearly impossible for the immigration court to assess the report's probative value and the [petitioner] is not allowed a meaningful opportunity to rebut the investigation's allegations."); *Alexandrov*, 442 F.3d at 407 ("We do not know who the investigator was . . . We do not know how the investigation was conducted. . . . There is not much that we do know aside from the apparent conclusions of the mysterious investigation. . . . We conclude that the [government's] reports in this case do not meet our standards of

trustworthiness and reliability and therefore were improperly relied upon by the immigration court.").

The ROI's indicia of reliability are further undermined because, despite their limited ability to rebut the ROI's findings, the Grigoryans were nonetheless able to show that half of the identified documents were not fraudulent. In addition, the mere fact that the ROI is a DHS document does not absolve the government from affording the Grigoryans a fair opportunity to rebut its assertions. *See Ezeagwuna*, 325 F.3d at 407 ("[W]e are concerned that the INS is attempting to use the prestige of the State Department letterhead to make its case and give credibility to the letter's contents. . . . [T]he [BIA's] decisions cannot be sustained simply by invoking the State Department's authority." (quoting *Li Wu Lin v. INS*, 238 F.3d 239, 246 (3d Cir. 2001))). For all these reasons, we conclude that reliance on the ROI was fundamentally unfair.**[8]**

Relying on our decision in *Angov*, the government argues that the Grigoryans were not denied due process. In *Angov*, we held that the IJ's admission of, and reliance on, a letter prepared by a Department of State employee summarizing an overseas investigation did not violate the statutory rights of an asylum applicant. 788 F.3d at 899–900. *Angov* does not control, however, for one important reason: that case did not implicate constitutional due

---

**[8]** DHS argues that the Grigoryans had five months to review and examine the ROI and, therefore, they had an "opportunity to rebut the [ROI]'s findings." The fact that the Grigoryans may have had access to the ROI, however, does not cure the due process violation because it does not change the reality that the Grigoryans were not given a proper opportunity to rebut the report's allegations. *See, e.g.*, *Anim*, 535 F.3d at 250–51, 262 (finding due process violation even though petitioner had knowledge of the government's report for many months).

process.  *See id*. at 898 n.3.  Because *Angov* involved an asylum applicant who had not "technically 'entered' the United States," *id.* at 898 (quoting *Mezei*, 345 U.S. at 212), we examined only whether the government violated the statutory rights that Congress afforded such applicants, *id.* at 898–99.   By contrast, our sister circuits that have considered the due process question before us have held that reliance on government records such as the ROI violates the Fifth Amendment.  *See Banat*, 557 F.3d at 891–93; *Anim*, 535 F.3d at 256–62; *Alexandrov*, 442 F.3d at 407; *Ezeagwuna*, 325 F.3d at 405–08.  We join those circuits today and conclude that *Angov* does not foreclose the due process claims of petitioners like the Grigoryans, who are protected by the Fifth Amendment.[9]

It cannot be seriously disputed that the Grigoryans were prejudiced by the ROI's admission and consideration.  The ROI was the only evidence DHS introduced to support its fraud allegations, and the BIA accorded it "considerable weight."  Indeed, the government conceded at oral argument that without admission of the ROI, fraud was not established by a preponderance of the evidence.  Based on the ROI's

---

[9] *Angov* is also distinguishable because the petitioner in that case bore the burden of proof at the hearing.  788 F.3d at 903.  As a result, DHS sought to admit the letter in question "solely to rebut or impeach petitioner's case."  *Id.*  We acknowledged that the letter "lack[ed] certain indicia of reliability," but in light of the burden allocation and pursuant to "our 'extremely deferential' review" of adverse credibility determinations, we concluded in *Angov* that admission of the letter did not constitute grounds to disturb the agency's denial of asylum.  *Id.* at 902–03 (quoting *Wang v. INS*, 352 F.3d 1250, 1257 (9th Cir. 2003)). Here, by contrast, the government bore the burden of proving the grounds for terminating the Grigoryans' asylum status by a preponderance of the evidence.  *Urooj*, 734 F.3d at 1078 (citing 8 C.F.R. § 1208.24(f)).  DHS indeed sought to introduce the ROI to meet this heavy burden, not merely for impeachment purposes as it did in *Angov*.

findings, the IJ terminated not only Petitioner's asylum status, but also that of his wife and children. In turn, the IJ found the Grigoryans removable and ordered them deported after they had built their lives in the United States for nearly fourteen years. We thus have no difficulty concluding that the IJ's admission of, and reliance on, the ROI was substantially prejudicial. *See Cruz Rendon*, 603 F.3d at 1111.

The IJ's error was compounded by the fact that Petitioner had previously testified before the same IJ in 2010. Because USCIS incorrectly terminated the Grigoryans' asylum status without congressional authority in 2005, Petitioner was improperly forced to re-apply for asylum and to testify in support of his claim. Therefore, at the 2010 hearings, Petitioner was erroneously assigned the burden of proof and the government sought to introduce the ROI to impeach him. The IJ's reliance on the ROI thus resulted in a series of improper adverse credibility findings against Petitioner.

The IJ then infused the 2015 termination proceedings with the testimony improperly obtained from Petitioner in 2010. Instead of conducting a new hearing in 2015, and forcing the government to prove *first and foremost* that termination of asylum was warranted notwithstanding what transpired in 2010, the IJ instead referred back to her adverse credibility findings from the 2010 hearings. As a result, the IJ effectively conflated the findings from two proceedings with different burden allocations. The sequence and manner in which the IJ entered her findings further prejudiced the Grigoryans. *See Colmenar*, 210 F.3d at 973 ("We do not enjoy second-guessing the way Immigration Judges run their courtrooms. But when a petitioner has so clearly been denied a full and fair hearing, we have no choice. . . . This is consistent with our role as judges, and the values of our

Constitution demand no less."); *see also Urooj*, 734 F.3d at 1079 (noting that it is an error to "improperly conflate[] impeachment evidence with substantive evidence").

It is also worth noting that DHS bears the initial burden of proving, by a preponderance of the evidence, "fraud in [Petitioner]'s application such that he . . . was not eligible for asylum at the time it was granted." 8 C.F.R. §§ 208.24(a)(1), 1208.24(a)(1); *see Matter of P-S-H-*, 26 I. & N. Dec. at 337 ("[A]lthough the Immigration Judge summarily concluded that this fraud was such that the respondent was not eligible for asylum at the time it was granted, she did not adequately consider whether the respondent was eligible for asylum in 2003 but for the fraud in his application."). In other words, DHS must not only show that certain documents submitted with Petitioner's original application for asylum were fraudulent. The government's burden here is much higher: It must show that Petitioner would not have been granted asylum *in 2001 but for* the fraudulent documents. *Matter of P-S-H-*, 26 I. & N. at 337. If, and only if, the government meets this heavy burden, does the burden shift to the Grigoryans to prove they are entitled to relief from deportation.[10]

---

[10] We decline to decide at this juncture whether DHS must show that Petitioner knew the documents were fraudulent. A serious question is raised, however, whether the government can establish "fraud" in the application without establishing that Petitioner knew the documents were fraudulent. *Compare Matter of P-S-H-*, 26 I. & N. Dec. at 336 ("[W]e conclude that the regulations do not require the DHS to establish, for purposes of showing that there was fraud in [petitioner's] asylum application, that the [petitioner] knew of the fraud."), *with Ntangsi v. Gonzales*, 475 F.3d 1007, 1012 (8th Cir. 2007) ("[T]he government cannot meet its burden of proving fraud unless it can show that the petitioner knows the statement or document is fraudulent at the time she

**IV.**

Because we find that admission of, and reliance on, the ROI was improper and the ROI is the only purported evidence of fraud in Petitioner's application, we grant the petition, vacate the BIA's decision and the IJ's order of removal, and remand the case to the BIA to conduct further proceedings consistent with this opinion. In any new hearing, the government must first prove asylum termination is warranted by a preponderance of the evidence. If the Grigoryans' asylum status is properly terminated, the agency must then conduct a hearing to allow the Grigoryans an opportunity to seek asylum and other relief from deportation. On remand, the government must afford the Grigoryans a full and fair opportunity to challenge the ROI.

**PETITION FOR REVIEW GRANTED, VACATED, AND REMANDED WITH INSTRUCTIONS**. The government shall bear the costs on appeal.

---

presents such evidence[.]"); *see also Yeimane-Berhe v. Ashcroft*, 393 F.3d 907, 911 (9th Cir. 2004) (holding that fraudulent documents without knowledge are insufficient to deny asylum); *In re Tijam*, 22 I. & N. Dec. 408, 424 (BIA 1998) ("Fraud requires that the respondent know the falsity of his or her statement[.]"); *Matter of G-R-*, 7 I. & N. Dec. 508, 510 (BIA 1957) (interpreting "fraud" to mean a "false representation or concealment of a material fact, made *with knowledge* of its falsity and with intent to deceive the other party" (emphasis added)).